1
2
3
4
5                    DISTRICT COURT OF GUAM

6                     TERRITORY OF GUAM

7

8  **IN THE MATTER OF MAJESTIC BLUE**      )   CIVIL CASE NO. 11-00032
   **FISHERIES, LLC, AS OWNER OF THE**    )
9  **F/V MAJESTIC BLUE PETITIONING**       )
   **FOR EXONERATION FROM OR**            )
10 **LIMITATION OF LIABILITY,**            )       **FINDINGS OF FACT**
                                          )              **AND**
11                 **Petitioner.**         )     **CONCLUSIONS OF LAW**
   _____    )

12

13        This matter came before the court for trial without the presentation of live testimony or

14 evidence based upon a stipulation entered into between the parties. Docket Entry ("DE") 141.

15 By stipulation, the parties agreed that:

16        1. The court should consider all motions, responses, and replies already filed and those

17 to be filed by November 6, 2013 in the two related cases (CV11-00032 and CV11-00034).

18        2. That all experts who have been deposed in the case for either Majestic Blue,

19 Dongwon, or Claimant Amy Hill are qualified to give opinion testimony on the subjects they

20 were proffered to opine on and did opine on in support of the motions, replies, and responses

21 described above.

22        3. These motions, responses, and replies (including the exhibits cited in support thereof)

23 will be considered as evidence as if presented and received at trial.

24        4. Proposed findings of fact and conclusions of law and any exhibits attached thereto

25 submitted by the parties will also be considered by the court.

26        5. All experts who have been deposed in this case for either Majestic Blue, Dongwon, or

27 Claimant Amy Hill are qualified to give opinion testimony on the subjects that they were

28 proffered to opine on. These experts would testify as if at trial only through their

transcribed depositions and no other source or means.

6. In connection with lay testimony, the court will consider all evidence cited in the filed motions, responses and replies, as well as what the parties have submitted in their proposed findings of fact and conclusions of law, so long as the testimony or exhibit is supported by citation to existing deposition testimony and no other source or means.

7. The trial will move forward based upon the above-described written submissions alone, and no others.

On February 12, 2014, while the matter was pending decision by the court, Petitioner filed a motion to compel Claimant Esther Yang to submit her claim to arbitration. DE 178. In its motion, Petitioner alleged that Chang Cheol Yang, Claimant Yang's deceased husband, entered into an employment agreement with Petitioner on March 23, 2010 to work as Chief Engineer on board the Majestic Blue. The employment agreement provided that all claims arising out of the employee's employment aboard the Majestic Blue be subject to "mandatory binding arbitration." In the alternative, Petitioner moved for summary judgment based upon Claimant Yang's execution of a settlement agreement with Petitioner on July 23, 2010. Therein, it is alleged that she purportedly agreed to settle all disputes arising out of her husband's employment for a certain sum of money payable in Korean currency. After briefing, the court heard the motion on May 28, 2014 and took the matter under advisement. On June 11, 2014 the court denied Petitioner's motion. DE 207.

The court then proceeded to hear closing arguments from the parties on June 18, 2014.

Having taken into consideration the evidence presented in this matter and having further heard closing arguments, the court renders its findings of fact and conclusions of law herein.

## I. BACKGROUND

Petitioner, the owner of the fishing vessel Majestic Blue, filed a complaint[1] for exoneration and limitation of liability in this court, seeking to limit its liability under 46 U.S.C.A. § 30505, for all damages occasioned by the sinking of its vessel the Majestic Blue on

---

[1]See Civil Case No. 10-00032 filed on December 9, 2010.

June 14, 2010. Two of the crew members, Captain David Hill and Chief Engineer Yang, lost their lives when the vessel sank. Twenty-two crew members, all of whom boarded the Main Skiff, were rescued hours later.

On February 24, 2012, the Clerk of Court gave Notice to all parties of the action brought by Petitioner for exoneration from or limitation on its liability. DE 40. The Notice directed all claimants desiring to contest the right to exoneration or limitation of liability to file an answer to the petition by March 30, 2012. Claimant Amy Hill filed an answer on March 30, 2012 (DE 45) and claimed her right to the limitation fund. Claimant Esther Yang filed her answer on June 14, 2013. DE 76.

## II. DISCUSSION

Section 30505 limits the liability of an owner of a vessel for any claim or debt to the value of its vessel and pending freight. In its complaint for exoneration from and limitation of liability, Petitioner alleged that the total value of its interest in the Majestic Blue did not exceed the sum of $33,500.00 which represented the value of the Main Skiff and life jackets as the Majestic Blue sank with all its appurtenances and equipment in the Western Pacific and was not recovered. On February 24, 2012, the court approved Petitioner's declaration of value of its interest in the Majestic Blue in the amount of $33,500.00. DE 38.

In a limitation action, the determination whether a vessel owner may limit its liability involves a two-step process. There must be a (1) a determination of what acts of negligence or unseaworthiness caused the Majestic Blue to sink and (2) whether Petitioner had knowledge or privity of these acts.

In order to limit its liability, Petitioner must show that all claims and losses subject to limitation were "done, occasioned, or incurred, without the privity[2] or knowledge of the owner."

In order for Claimants to prevail, they must show that (1) the Majestic Blue was not a seaworthy vessel and illustrate what acts of negligence or unseaworthiness caused the Majestic Blue to sink and (2) show that Petitioner has failed to meet its burden that it had no privity or

[2]See Section 30505(b) of 46 U.S.C.A.

knowledge of the negligent acts that caused the Vessel to sink or of the ship's unseaworthiness. Thus, Claimants have the initial burden of proving acts of negligence or unseaworthiness that caused the Majestic Blue to sink. Once Claimants satisfy their burden, the burden of proof then shifts to Petitioner to show that it lacked privity or knowledge. If Claimants fail in their burden of proving acts of negligence or unseaworthiness, then Petitioner is exonerated from liability.

**A.     Claimant's Exhibits Filed Herein**

In a motion for summary judgment [DE 100] filed herein on September 25, 2013, Claimant Hill included the following exhibits:

1. DE 100-Exhibit A.  Affidavit of Jurgen Unterberg.

2. DE 100-Exhibit B.  Transcript of Deposition of Jurgen Unterberg.

3. DE 100-Exhibit C.  Transcript of Deposition of Thomas Ridenour.

4. DE 100-Exhibit D.  Transcript of Deposition of Thomas Ridenour.

5. DE 100-Exhibit E.  Transcript of Deposition of Jurgen Unterberg.

6. DE 100-Exhibit F.  Authenticated Survey Report of Jurgen Unterberg.

7. DE 100-Exhibit G.  Order from General Manager to Captain Hill.

8. DE 100-Exhibit H.  Statement of Ellis Taleu, Jr.

9. DE 100-Exhibit I.  Daily Noon Reports Produced by Majestic Blue

10.  DE 100-Exhibit J.  Transcript of Deposition of Thomas Ridenour

On October 26, 2013, Claimant Hill filed herein a listing of the exhibits in the companion case, CV11-00034, that she referenced in support of her motion herein. These exhibits were filed under DE 133 and included below as follows:

11.  DE 133-1 and 133-2-Exhibit 1 – Authenticated Survey Report of Jurgen Unterberg (filed in two parts).

12.  DE 133-3, 133-4 and 133-5-Exhibit 2 – Photos showing the grossly degraded corroded condition of Vessel (filed in three parts).

13.  DE 133-6-Exhibit 3 – May 10, 2010 Capt. Ridenour e-mail to Jurgen Unterberg re: Poor Welds.

14.  DE 133-7-Exhibit 4 – May 14, 2010 E-mail from Capt. Hill to his wife re: Chaos on

Ship.

15. DE 133-8-Exhibit 5 – May 11, 2010 E-mail from Ridenour re: much work left to do.

16. DE 133-9-Exhibit 6 – May 2, 2012) Jurgen Unterberg Deposition Excerpts.

17. DE 133-10-Exhibit 7 – Sampling of Daily Noon Reports of Majestic Blue.

18. DE 133-11-Exhibit 8 - U.S.C.G. Commercial Fishing Vessel Safety Examination.

19. DE 133-12-Exhibit 9 - Order from Jurgen Unterberg to Hill regarding Excessive Water Ingress.

20. DE 133-13-Exhibit 10 - U.S.C.G. Activity Summary Report.

21. DE 133-14-Exhibit 11 - Declaration of Ellis Taleu.

22. DE 133-15-Exhibit 12 - Email from Hill while onboard MAJESTIC BLUE to Jurgen Unterberg.

23. DE 133-16-Exhibit 13 - Excerpt- Deposition of Edward Ratigan.

24. DE 133-17-Exhibit 14 - Excerpt from Transcript of Deposition of 3rd Engineer and Survivor Herman Wattimena.

25. DE 133-18-Exhibit 15 - Excerpt from Transcript of Deposition of Bong Soo Kim.

26. DE 133-19-Exhibit 16 - Excerpt from Transcript of Defense Expert Shortall.

27. DE 133-20-Exhibit 17 – May 9, 2010 Email from Ridenour to Unterberg re: no trained crew.

28. DE 133-21-Exhibit 18 - November 18, 2011 - Excerpt from Transcript of Deposition of Thomas Ridenour.

29. DE 133-22-Exhibit 19 - Crew Statement of Sungil Shin.

30. DE 133-23-Exhibit 20 - Crew Statement of Cho Kyehoon.

31. DE 133-24-Exhibit 21 - Excerpt from Deposition of John Timmel.

32. DE 133-25-Exhibit 22 - Email re: need to speak Korean to communicate with Crew.

33. DE 133-26-Exhibit 23 - January 18, 2013 – Excerpt from Transcript of Deposition of Thomas Ridenour Vol. 1.

34. DE 133-27-Exhibit 24 - January 18, 2013 – Excerpt from Transcript of Deposition of Thomas Ridenour Vol. 2.

35.  DE 133-28-Exhibit 25 – February 18, 2013 – Excerpt from Transcript of Deposition of Thomas Ridenour Vol. 4.

36.  DE 133-29-Exhibit 26 – Excerpt from Transcript of Deposition of Dongwon's Kuk-Hee Han.

37.  DE 133-30-Exhibit 27 – Photo of Bilge Pump Push Buttons.

38.  DE 133-31-Exhibit 28 – Excerpt from Transcript of Deposition of B.H. Lee.

39.  DE 133-32-Exhibit 29 - Crew Statement of Joseph Navarro.

40.  DE 133-33-Exhibit 30 - Crew Statement of Keum Moosub.

41.  DE 133-34-Exhibit 31 – Excerpt from Transcript of Deposition of Majestic Blue Expert Stephen Tierney.

42.  DE 133-35-Exhibit 32 - Email re: need to get a lazy & stupid inspector to pass the Majestic Blue.

43.  De 133-36-Exhibit 33 – Copies of Unpublished Cases Cited in Motion.

Claimant also made references to four exhibits in her filing under DE 134.  These exhibits were as follows:

44.  DE 134-Ex. 1, Part I containing 33 pictures of the condition of the Vessel.

45.  DE 134-Ex. 1, Part II containing 33 pictures of the condition of the Vessel.

46.  DE 134-Ex. 1, Part III containing 46 pictures of the condition of the Vessel.

47.  DE 134-Ex. 2 - Sworn Statement of Thomas Ridenour dated October 11, 2013.

In support of her summary judgment motion, Claimant Hill also made reference to DE 135 and included therein a diagram as an exhibit and included below as:

48.  DE 135-Diagram Showing Drain Pipe Taking Water.

Claimant Hill also included ten exhibits in her reply argument.  See DE 125.  These ten exhibits are incorporated herein as follows:

49.  DE 125-Exhibit 1: Unterberg's Authenticated Survey Report (part a).

50.  DE 125-Exhibit 2: Unterberg's Authenticated Survey Report (part b).

51.  DE 125-Exhibit 3: Excerpts from Deposition Transcript of Captain Thomas Ridenour dated 1/18/2013.

52. DE 125-Exhibit 4: Report of Captain Thomas Ridenour to Mr. Hwang dated July 7, 2010.

53. DE 125-Exhibit 5: Excerpts from Deposition Transcript of Captain John Timmel.

54. DE 125-Exhibit 6: Excerpts from Deposition Transcript of Captain Edward Ratigan.

55. DE 125-Exhibit 7: Declaration of Ellis Taleu, Jr.

56. DE 125-Exhibit 8: Excerpts from Deposition Transcript of Jurgen Unterberg dated May 2, 2012

57. DE 125-Exhibit 9: U.S.C.G. Activity Report dated 5/17/2010.

58. DE 125-Exhibit 10: Daily Noon Reports.

The list of exhibits which Claimant has asked the court to consider also include those exhibits she referenced in her opposition to Petitioner's motion for summary judgment. These exhibits were filed in DE 118 and include 24 in number. The exhibits are included below as follows:

59. DE 118-Exhibit 1 – Deposition Transcript of Petitioner's Expert Kenneth Shortall.

60. DE 118-Exhibit 2 – Deposition Transcript of Claimant's Expert John Timmel.

61. DE 118-Exhibit 3 - Deposition Transcript of Claimant's Expert James Dolan.

62. DE 118-Exhibit 4 - Deposition Transcript of Bong Soo Kim.

63. DE 118-Exhibit 5 – Daily Noon Reports.

64. DE 118-Exhibit 6 – United States Coast Guard Activity Report.

65. DE 118-Exhibit 7 – Authenticated Survey Report of Jurgen Unterberg (part 1).

66. DE 118-Exhibit 8 – Authenticated Survey Report of Jurgen Unterberg (part 2).

67. DE 118-Exhibit 9 – Statement of Joseph P. Navarro.

68. DE 118-Exhibit 10 – Statement of Ricky P. Say.

69. DE 118-Exhibit 11 – Statement of Ellis Taleu, Jr.

70. DE 118-Exhibit 12 – Statement of Sungil Shin.

71. DE 118-Exhibit 13 – Declaration of Ellis Taleu, Jr.

72. DE 118-Exhibit 14 – U.S.C.G. Commercial Fishing Vessel Safety Examination Checklist.

73. DE 118-Exhibit 15 - Deposition Transcript of Herman Wattimena.

74. DE 118-Exhibit 16 – Deposition Transcript of Jurgen Unterberg.

75. DE 118-Exhibit 17 – Statement of Cho Keyhoon.

76. DE 118-Exhibit 18 - Statement of Keum Moosub.

77. DE 118-Exhibit 19 – Deposition Transcript of Edward Ratigan.

78. DE 118-Exhibit 20 – Statement of Namyong Bak.

79. DE 118-Exhibit 21 – Statement of Jeon Seok Yong.

80. DE 118-Exhibit 22 - Deposition Transcript of Claimant's expert Chris Law.

81. DE 118-Exhibit 23 – Deposition Transcript of Petitioner's expert Stephen Tierney.

82. DE 118-Exhibit 24 – Certificates of Documentation for F/V MAJESTIC BLUE and F/V PACIFIC BREEZE.

On November 18, 2013, Claimants Hill and Yang submitted their list of exhibits for consideration by the court for purposes of the trial herein. See DE 153. These exhibits number 47 and are listed herein below as follows:

83. DE 153-Exhibit 01 - Deposition of Kuk-Hee Han on 04-03-13 in Seoul, Korea.

84. DE 153-Exhibit 02 - pp. 16-17 of Jurgen Unterberg deposition filed.

85. DE 153-Exhibit 03 - Certificate of Documentation for Pacific Breeze issued May 21, 2008.

86. DE 153-Exhibit 04 - Abstract of title for Pacific Breeze dated 06-29-10.

87. DE 153-Exhibit 05 - Letter to Tom from Jurgen Unterberg dated 01-21-10.

88. DE 153-Exhibit 06 - Request for UL and FOT forms by Ed Ratigan of Pacific Breeze.

89. DE 153-Exhibit 07 - Letter from Captain J. A. Jeskevicius to Captain Unterberg dated 12-05-08.

90. DE 153-Exhibit 08 - Captain John Jeskevicius letter to Sam Lee dated 12-08-08.

91. DE 153-Exhibit 09 - Deposition of John Jeskevicius dated 02-28-13.

92. DE 153-Exhibit 10 - Memo from Captain Jeskevicius to Captain Unterberg dated 12-02-08.

93. DE 153-Exhibit 11 - Memo from Captain Jeskevicius to Captain Unterberg dated 12-28-08.

94. DE 153-Exhibit 12 - Memo from Captain Jeskevicius to Captain Jil of Pacific Breeze dated 12-29-08.

95. DE 153-Exhibit 13 - Memo from Captain Jeskevicius to Captain Unterberg dated 01-04-09.

96. DE 153-Exhibit 14 - Memo from Captain Jeskevicius to Captain Unterberg dated 12-27-08.

97. DE 153-Exhibit 15 - Captain Pine entries on Vessel log book.

98. DE 153-Exhibit 16 - certain emails from October, 2009.

99. DE 153-Exhibit 17 - email from Ridenour to Unterberg dated 01-12-2010.

100. DE 153-Exhibit 18 - Email from Ridenour to Unterberg dated 02-05-2010.

101. DE 153-Exhibit 19 - Deposition of Thomas Ridenour dated November 18, 2011.

102. DE 153-Exhibit 20 - Deposition of Thomas Ridenour dated February 18, 2013.

103. DE 153-Exhibit 21 - Deposition of Ridenour dated January 18, 2013.

104. DE 153-Exhibit 22 - Email from Ridenour to Unterberg dated January 10, 2010.

105. DE 153-Exhibit 23 - Email from Unterberg to Ridenour dated January 19, 2010.

106. DE 153-Exhibit 24 - Email from Unterberg to Ridenour dated January 23, 2010.

107. DE 153-Exhibit 25 - Email-letter from Unterberg to Ridenour dated February 2, 2010.

108. DE 153-Exhibit 26 - Email from Ridenour to Unterberg dated March 17, 2010.

109. DE 153-Exhibit 27 - Deposition of Byeong-Hyeok Lee on December 20, 2012.

110. DE 153-Exhibit 28 - Emails from Unterberg and Ridenour to each other dated January 31, 2010.

111. DE 153-Exhibit 29 - Email from Ridenour to Unterberg dated February 16, 2010.

112. DE 153-Exhibit 30 - Emails from Hill and Unterberg dated February and March, 2010.

113. DE 153-Exhibit 31 - Emails from Unterberg and Ridenour dated March 28, 2010.

114. DE 153-Exhibit 32 - Email from Ridenour to Unterberg dated April 1, 2010 noon report.

115. DE 153-Exhibit 33 - Emails from Unterberg and Ridenour dated April 28, 2010.

116. DE 153-Exhibit 34 - Emails from Unterberg and Unterberg dated April 25, 2010.

117. DE 153-Exhibit 35 - Email from Unterberg to Ridenour dated March 22, 2010.

118. DE 153-Exhibit 36 - Emails from Unterberg and Ridenour dated April 26-27, 2010.

119. DE 153-Exhibit 37 - Email from Ridenour to Unterberg dated March 16, 2010.

120. DE 153-Exhibit 38 - Email to all officers and engineers from Unterberg dated May 5, 2010.

121. DE 153-Exhibit 39 - Email from Ridenour to Unterberg dated May 8, 2010.

122. DE 153-Exhibit 40 - MAB Vessel safety examination dated June 16, 2008.

123. DE 153-Exhibit 41 - Deposition of Edward Ratigan dated April 10, 2013.

124. DE 153-Exhibit 42 - Deposition of Jurgen Unterberg dated May 2, 2012.

125. DE 153-Exhibit 43 - Statement by Moosub Keum.

126. DE 153-Exhibit 44 - Deposition of Chris Law dated August 14, 2013.

127. DE 153-Exhibit 45 - Deposition of Herman Wattimena dated October 11, 2012.

128. DE 153-Exhibit 46 - Statement by Ellis Taleu Jr.

129. DE 153-Exhibit 47 - Statement of War Jani oiler from Indonesia.

Altogether, Claimants have submitted at least 129 exhibits to the court for its consideration. Some of these exhibits have been referenced more than once. Claimants have also referenced other exhibits in the companion case, most of which have been incorporated herein, in addition to the ones noted above. See DE 325 and DE 353 in companion Civil Case No. 11-00034.

**B.      Petitioner's Exhibits Filed Herein**

Petitioner filed its motion for summary judgment herein on September 25, 2013. See DE 104. In support of its summary judgment motion, Petitioner included fourteen exhibits. These exhibits are included herein as follows:

1. DE 106 Exhibit "1" - Excerpts of the deposition transcript of Jurgen Unterberg, dated May 2, 2012, consisting of approximately 10 pages.

2. DE 106 Exhibit "2" - Excerpts of the deposition transcript of Byeong-Hyeok Lee taken on December 20, 2012, consisting of approximately 11 pages.

3. DE 106 Exhibit "3" - Excerpts of the deposition transcript of Jurgen Unterberg taken on May 2, 2012, consisting of approximately 30 pages.

4. DE 106 Exhibit "4" - Excerpts of the deposition transcript of Thomas Ridenour taken on February 18, 2013, consisting of approximately 13 pages.

5. DE 106 Exhibit "5" - Excerpts of the deposition transcript of Bong Soo Kim taken on June 27, 2013, consisting of approximately 27 pages.

6. DE 106 Exhibit "6" - Excerpts of the deposition transcript of Herman Wattimena taken on October 11, 2012, consisting of approximately 13 pages.

7. DE 106 Exhibit "7" - Statement and Affidavit of Jung II Shin, 2nd Officer dated June 14, 2010, as it is taken from Exhibit 10, excerpts of the deposition of Kenneth Shortall, consisting of approximately four pages.

8. DE 106 Exhibit "8" - Statement and Affidavit of Moo Sup Keum dated June 14, 2010, as it is taken from Exhibit 10, excerpts of the deposition of Kenneth Shortall, consisting of approximately three pages.

9. DE 106 Exhibit "9" - Statement and Affidavit of Nam Yong Park (Bak), dated June 14, 2010, taken from Exhibit 10, of the excerpts of the deposition of Kenneth Shortall, consisting of approximately four pages.

10. DE 106 Exhibit "10" - Statement and Affidavit of Yong-Suk Chun, Chief Fisherman, dated June 14, 2010, taken from Exhibit 10, of the excerpts of the deposition of Kenneth Shortall, consisting of approximately four pages.

11. DE 106 Exhibit "1 1" - Excerpts of the deposition transcript of James Dolan taken on August 13, 2013, consisting of approximately seven pages.

12. DE 106 Exhibit "12" - Excerpts of the deposition transcript of Chris Law taken on August 14, 2013, consisting of approximately eight pages.

13. DE 106 Exhibit "13" - Excerpts of the deposition transcript of Stephen Tierney taken on July 18, 2013, consisting of approximately five pages.

14. DE 106 Exhibit "14" - Excerpts of the deposition transcript of Kenneth Christopher Shortfall taken on July 17, 2013, consisting of approximately 13 pages.

On October 16, 2013, Petitioner filed its reply to Claimant's opposition to its motion for summary judgment. Petitioner filed seven exhibits in DE 124 and these exhibits are numbered herein as:

15. DE 124-Exhibit "1" - Excerpts of the deposition transcript of Herman Wattimena taken on October 11, 2012, consisting of approximately nine pages.

16. DE 124-Exhibit "2" - Excerpts of the deposition transcript of Bong Soo Kim taken on June 27, 2013, consisting of approximately seven pages.

17. DE 124-Exhibit "3" - Excerpts of the deposition transcript of James Dolan taken on August 13, 2013, consisting of approximately four pages.

18. DE 124-Exhibit "4" - Excerpts of the deposition transcript of Jeffrey Fischer taken on August 19, 2013, consisting of approximately six pages.

19. DE 124-Exhibit "5" - Copy of the United States Coast Guard Report.

20. DE 124-Exhibit "6" - Excerpts of the deposition transcript of David B. Cooke, P.E. taken on August 16, 2013, consisting of approximately five pages.

21. DE 124-Exhibit "7" - Excerpts of the deposition transcript of Jurgen Unterberg taken on May 2, 2012, consisting of approximately six pages.

On October 9, 2013, Petitioner filed its opposition to Claimant's Motion for Summary Judgment. DE 119. Petitioner referenced 9 exhibits filed under DE 120. Exhibit 2 contained references to 5 exhibits. All of these exhibits have been included below and numbered accordingly as follows:

22. DE 120-Exhibit 1 - Excerpts of the deposition transcript of Captain Thomas Ridenour, dated February 18, 2013, consisting of approximately four pages.

23. DE 120-Exhibit 2, Deposition Exhibit A. Order from Jurgen Unterberg to Captain Hill about monitoring the leak.

24.  DE 120-Exhibit 2, Deposition Exhibit B.  Daily Noon Reports.

25.  DE 120-Exhibit 2, Deposition Exhibit 53.  Email from Captain Ridenour to Captain Hill dated April 23, 2010.

26.  DE 120-Exhibit 2, Deposition Exhibit 55.  Email from Captain Hill to Amy Hill dated May 18, 2010.

27.  DE 120-Exhibit 2, Deposition Exhibit 60.  Pacific Breeze Report for June14, 2010.

28.  DE 120-Exhibit 3 - Excerpts of the deposition transcript of John Timmel taken on August 15, 2013, consisting of approximately 12 pages.

29.  DE 120-Exhibit 4 - Excerpts of the deposition transcript of Jurgen Unterberg taken on May 2, 2012, consisting of approximately 10 pages.

30.  DE 120-Exhibit 5 -  Statement and Affidavit of Ellis Taleu, Jr. dated June 14, 2010 used as an Exhibit in the deposition of Kenneth Shortall, consisting of approximately 10 pages.

31.  DE 120-Exhibit 6 - Statement and Affidavit of Jung-Il Shin,[3] 2nd Officer, dated June 14, 2010 and used as "Exhibit "10" in the deposition of Kenneth Shortall, consisting of approximately five pages.

32.  DE 120-Exhibit 7 - Excerpts of the deposition transcript of Jeffrey Fischer taken on August 19, 2013, consisting of approximately seven pages.

33.  DE 120-Exhibit 8 - Excerpts of the deposition transcript of Herman Wattimena taken on October 11, 2012, consisting of approximately four pages.

34.  DE 120-Exhibit 9 - Excerpts of the deposition transcript of Byeong-Hyeok Lee taken on December 20, 2012, consisting of approximately seven pages.

On November 18, 2013, Petitioner submitted its list of exhibits to be used for purposes of the trial herein.  These exhibits are included below and referenced in relation to their

_____

[3]The court notes that Jung-Il Shin and Sungil Shin are the same person with different names referenced in various exhibits herein.  The court will refer to him simply as Sungil Shin in all subsequent references.

docket entry numbers.

35. DE 154. Exhibit 1-Part One. Deposition of Jurgen Unterberg taken on May 2, 2012, consisting of approximately 140 pages.

36. DE 154. Exhibit 1-Part Two. Exhibit Files to the Deposition of Jurgen Unterberg taken on May 2, 2012, consisting of approximately 131 pages.

37. DE 155-1. Deposition of Kenneth Shortall taken on July 17, 2013, consisting of approximately 126 pages.

38. DE 157 Exhibit A. U.S. Coast Guard Report

39. DE 157 Exhibit B. Captain David Hill Resume

40. DE 157 Exhibit C-1. Crew Missing Accident Report, dated June 14, 2010, signed by Bong Soo Kim (Chief Officer) and Seok Jeon Yong (Fishing Master).

41. DE 157 Exhibit C-2. Missing Crew member Report, dated June 14, 2010, signed by Bong-Su Kim (First Officer) and Yong-Suk Chun (Chief Fisherman).

42. DE 157 Exhibit C-3. Statement or Report in a foreign language.

43. DE 157 Exhibit C-4. Statement by Randelito C. Avenido from the Philippines, dated June 14, 2010.

44. DE 157 Exhibit C-5. Statement by Namyong Bak, Radio Officer from South Korea, dated June 14, 2010.

45. DE 157 Exhibit C-6. Affidavit by Nam-Yong Park, Communication Officer from the Republic of Korea.

46. DE 157 Exhibit C-7. Statement in foreign language by Nam-Yong Park from the Republic of Korea.

47. DE 157 Exhibit C-8. Statement by Minkeun Cha, 3rd Officer from South Korea, dated June 14, 2010.

48. DE 157 Exhibit C-9. Affidavit by Minkeun Cha, 3rd Officer from South Korea, dated June 14, 2010.

49. DE 157 Exhibit C-10. Statement in a foreign language by Minkeun Cha, 3rd Officer from South Korea, dated June 14, 2010.

1   50. DE 157 Exhibit C-11. Statement by Kyehoon Cho Cook, from South Korea,

2 dated June 14, 2010.

3   51. DE 157 Exhibit C-12. Affidavit by Gye-Hoon Cho, cook, from South Korea,

4 dated June 14, 2010.

5   52. DE 157 Exhibit C-13. Statement by Ha Ding Dang, deck man from Vietnam,

6 dated June 14, 2010.

7   53. DE 157 Exhibit C-14. Statement in a foreign language by Ha Ding Dang, deck

8 man from Vietnam, dated June 14, 2010.

9   54. DE 157 Exhibit C-15. Statement by Dahee Man, First Oiler from South Korea,

10 dated June 14, 2010.

11   55. DE 157 Exhibit C-16. Affidavit by Dae-Hui Han, Oiler from South Korea, dated

12 June 14, 2010.

13   56. DE 157 Exhibit C-17. Statement in a foreign language by Dae-Hui Han, Oiler

14 from South Korea, dated June 14, 2010.

15   57. DE 157 Exhibit C-18. Statement by War Jani, Oiler from Indonesia, dated June

16 14, 2010.

17   58. DE 157 Exhibit C-19. Statement in a foreign language by War Jani, Oiler from

18 Indonesia, dated June 14, 2010.

19   59. DE 157 Exhibit C-20. Statement by Seok Jeon Yong, Fishing Master from South

20 Korea, dated June 14, 2010.

21   60. DE 157 Exhibit C-21. Affidavit by Yong-Suk Chun, Chief Fisherman from

22 Korea,  dated June 14, 2010.

23   61. DE 157 Exhibit C-21. Statement in a foreign language.

24   62. DE 157 Exhibit C-22. Statement by Bong Soo Kim, Chief Officer, from South

25 Korea, dated June 14, 2010.

26   63. DE 157 Exhibit C-23. Affidavit by Bong Soo Kim, First Officer, from Korea,

27 dated June 14, 2010.

28   64. DE 157 Exhibit C-24. Statement in a foreign language by Bong Soo Kim, Chief

Officer, from South Korea, dated June 14, 2010.

65. DE 157 Exhibit C-25. Statement by Cheol Su Kim, Boatswain, from South Korea, dated June 14, 2010.

66. DE 157 Exhibit C-26. Affidavit by Cheol Su Kim, Boatswain, from South Korea, dated June 14, 2010.

67. DE 157 Exhibit C-27. Statement in a foreign language by Cheol Su Kim, from South Korea, dated June 14, 2010.

68. DE 157 Exhibit C-28. Statement by Moosub Keum, 2nd Engineer, from South Korea, dated June 14, 2010.

69. DE 157-3 Exhibit C-29. Affidavit by Moosub Keum, 2nd Engineer, from South Korea, dated June 14, 2010.

70. DE 157-3 Exhibit C-30. Statement in a foreign language by Moosub Keum, 2nd Engineer, from South Korea, dated June 14, 2010.

71. DE 157-3 Exhibit C-31. Statement by Joseph P. Navarro, Reefer Engineer, from the Philippines, dated June 14, 2010.

72. DE 157 Exhibit C-32. Statement by Michael G. Nebres, Deck Hand, from the Philippines, dated June 14, 2010.

73. DE 157 Exhibit C-33. Statement by Cong Van Nguyen, Deck Man, from Vietnam, dated June 14, 2010.

74. DE 157 Exhibit C-34. Statement in a foreign language by Cong Van Nguyen, Deck Man, from Vietnam, dated June 14, 2010.

75. DE 157 Exhibit C-35. Statement by Jomar F. Rusia, Deck Hand, from the Philippines, dated June 14, 2010.

76. DE 157 Exhibit C-36. Statement by Ricky P. Say, Electrician, from the Philippines, dated June 14, 2010.

77. DE 157 Exhibit C-37. Statement by Sungil Shin, 2nd Officer, from South Korea, dated June 14, 2010.

78. DE 157 Exhibit C-38. Affidavit by Sungil Shin, 2nd Officer, from South Korea,

dated June 14, 2010.

79. DE 157 Exhibit C-39. Statement in a foreign language Jung-Il Shin, from South Korea, dated June 14, 2010.

80. DE 157 Exhibit C-40. Statement by Syafril, Deck Hand, from Indonesia, dated June 14, 2010.

81. DE 157 Exhibit C-41. Statement in a foreign language by Syafril, Deck Hand, from Indonesia, dated June 14, 2010.

82. DE 157 Exhibit C-42. Typed statement by Ellis Taleu Jr., an Observer, from the Republic of Palau.

83. DE 157 Exhibit C-43. Written statement by Ellis Taleu Jr., an Observer, from the Republic of Palau, dated June 14, 2010.

84. DE 157 Exhibit C-44. Second written statement by Ellis Taleu Jr., an Observer, from the Republic of Palau, undated.

85. DE 157 Exhibit C-45. Statement by Rolando L. Viejo, Deck Hand, from the Philippines, dated June 14, 2010.

86. DE 157 Exhibit C-46. Written statement by Rolly L. Viejo, Oiler, from the Philippines, dated June 14, 2010.

87. DE 157 Exhibit C-47. Statement by Herman Wattimena, 3/E, from Indonesia, dated June 14, 2010.

88. DE 157 Exhibit C-47. Statement in a foreign language by Herman Wattimena, 3/E, from Indonesia, dated June 14, 2010.

89. DE 158. Excerpts of the deposition transcript of Herman Wattimena taken on October 11, 2012, consisting of approximately 112 pages.

90. DE 159. Deposition of James Dolan taken on August 13, 2013, consisting of approximately 47 pages.

91. DE 160-1. Deposition of Stephen Tierney taken on July 18, 2013, consisting of approximately 109 pages.

92. DE 161. Deposition of Bong Soo Kim taken on June 27, 2013, consisting of

approximately 66 pages.

93.  DE 162.  Deposition of Byeong-Hyeok Lee taken on December 20, 2012, consisting of approximately 89 pages.

94.  DE 163.  Deposition of Chris Law taken on August 14, 2013, consisting of approximately 88 pages.

95.  DE 164.  Deposition of Thomas Ridenour taken on January 18 and February 18, 2013, consisting of approximately 56 pages.

96.  DE 165.  Deposition of John Timmel taken on August 15, 2013, consisting of approximately 47 pages.

97.  DE 166.  Deposition of David B. Cooke, P.E. taken on August 16, 2013, consisting of approximately 17 pages.

98.  DE 167.  Deposition of Jeffery Fischer taken on August 19, 2013, consisting of approximately 7 pages.

With regard to its motion for summary judgment and opposition to Claimant's motion for partial summary judgment, as well the exhibits it has filed herein for purposes of the trial, Petitioner has referenced at least 98 exhibits for the court's consideration.  Some of these exhibits have been referenced more than once.

### C.    Negligent Acts or Unseaworthiness of the Vessel.

Claimants argue that under the general law which applies to vessel owners and seamen, the owners of the Majestic Blue owed a duty to provide a seaworthy vessel to Captain David Hill and the rest of the crew.  This duty, it is argued, is absolute and does not depend on the exercise of reasonable care, negligence, notice of the condition or opportunity to correct, citing *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539 (1960), and *Petterson v. Alaska S.S. Co.*, 205 F. 2d 478 (9th Cir. 1961).

Seaworthiness is the fitness of the vessel for a particular duty.  The basic thought is that the vessel shall be equipped to perform the duty of safety which she carries to the human beings on board and to the cargo which she carries.  With regard to personal injuries, Judge Learned Hand has reviewed the rule as follows:

In these cases the liability is the same as that to seamen at sea, and is measured by the same test as when the damage is to cargo: i.e., whether in hull and gear she was reasonably fit for the purpose of her voyage; and it is immaterial how much diligence may have been used if it fails to make her so. Trade customs and practices, while relevant and admissible, are not in themselves due care.

To be seaworthy, a vessel must be properly equipped and for that purpose there is a duty upon the owner to provide a competent master and crew adequate in number and competent for their duty and equal in disposition and seamanship to the ordinary men in the calling.

The Majestic Blue was owned by Petitioner Majestic Blue Fisheries, LLC, a limited liability corporation[4] established in Delaware on March 25, 2008. The Vessel was built in 1972 at Gijon, Spain and apparently was named the "Costa de Marfil." In 1979, the Costa de Marfil[5] was acquired[6] by Dongwon Industries Co., Ltd. (hereinafter called "Dongwon.") Based upon a Homeland Security U.S. Coast Guard Abstract of Title, the ship was registered in the Republic of Korea registry. Pursuant to a Bill of Sale, dated April 23, 2008, Dongwon sold the Vessel to Petitioner for the sum of $10.00. The Bill of Sale was filed with the above-referenced entity on May 15, 2008[7].

Petitioner had one shoreline employee, Jurgen Unterberg[8]. Unterberg was the General Manager for the company and he received a salary of $30,000.00 per year. According to Unterberg, the company had "two passive partners", namely Joyce Kim[9] and Jane Kim. Since he began his employment with the company, Unterberg had never seen the owners of Majestic Blue. He recalled, however, meeting with them when they were children while living in Guam.

The Kim sisters moved to Guam from Korea in the 1980's when they were very young.

---

[4]DE 339, Exhibit 19, CV11-00034.

[5] The Vessel was the first purse seiner owned by Dongwon.

[6] Hwang deposition, Exhibit D in DE 326, CV 11-00034, pp.67-68.

[7] DE 339, Exhibit 20, CV11-00034, opposition to motion for summary judgment.

[8]Subsequent to the filing of this action, Unterberg passed away.

[9]Section II.A.¶ 84-DE 153-2. Deposition of Jurgen Unterberg.

Joyce Kim was approximately four years old.  The move to Guam became necessary because their father, Jaewoong Kim (J. W. Kim), was heading Dongwon's office in Guam and would be its General Manager.  J. W. Kim held that position with Dongwon until he retired in the early 1990's[10] from Dongwon.  As the General Manager in Guam, J. W. Kim helped to establish Dongwon's fleet of purse seiners.

On or about May, 2008, Petitioner entered into two service contracts with Dongwon.  The first service contract was a Ship's Maintenance, Supply and Insurance Service Agreement.  Under this contract, Dongwon would arrange and supervise dry docking and repairs and maintain the Vessel to classification or U.S.C.G. standards.  Dongwon would also supply equipment and parts upon the owner's request.  DE 328-8, CV-11-00034.  The second contract with Dongwon was a "Crew Manning Agreement."  Under this agreement, Dongwon agreed to supply the crew to man the Vessel.  DE 328-9, CV 11-00034.

The Majestic Blue was approximately 36 years of age when it was purchased by Petitioner.  It was the oldest Vessel in Dongwon's fleet of vessels when it was sold to Petitioner.  Around the same time as its purchase, the Majestic Blue arrived on May 2, 2008 at the Port of Subic Bay[11] in the Philippines for dry docking repair.  Based upon its age, the Vessel was subject to a biannual dry dock schedule.  After the Philippines dry dock, its next biannual dry dock schedule would be May, 2010.

Questions regarding the quality of the dry dock repairs undergone in the past by Majestic Blue were raised by Unterberg.  In an email dated January 30, 2010 to Mr. Hwang and the Pusan Technical Office, he acknowledged the concerns by Captain Ridenour[12] that Majestic Blue "did not undergo good DD in the last few years."  Unterberg emphasized that Dongwon needed to decide whether they wanted to operate the Vessel in good order, meaning that the company would have had to spend "serious money" or if "they want to continoue (sic) to operate the boat

---

[10] See Deposition of Joyce Kim, DE 339, Exhibit 18, CV 11-00034.

[11] DE 326-1, Exhibit A, page 17, CV11-00034.

[12] Section II.A.¶ 87-DE 153-5.  Email from Unterberg to Ridenour dated 1-21-10.

with minimum repairs, which in the end will cause the unit to eventually sink!  Yes that is how

serious it is!"  Unterberg was also advocating the need for a U.S. representative to be there

during the dry dock at Pusan.  The company's partners there were bound by many customs that

worked against an honest dry dock repair.  Thus, Unterberg believed that the Majestic Blue

needed major or substantial repairs to be seaworthy.[13]

Shortly after Petitioner had acquired Majestic Blue, one of its Captains, John

Jeskevicius, in an email to Sam Lee[14], wrote that the Vessel was "a piece of crap" and that he

could not trust its crew.  The senior officers on board "were dumping everything over in plastic

bags" despite the prohibitions contained in MARPOL[15] Annex V.  Captain Jeskevicius in his

deposition described the Majestic Blue's condition as "(n)ot very good." He also said that its

seaworthiness "was suspect" and compared to other vessels that he was familiar with, it "was

the worst one I ever worked on as far as seaworthiness."[16]  As its Captain, the Vessel

experienced an engine casualty on December 2, 2008.[17]  The Vessel was in port in late

December, 2008, getting the main engine worked on.  Jeskevicius stated that the Korean

management was anxious to get the Vessel back to sea to fish that they sent over a gift box with

a couple of bottles of Korean wine as a means of expediting the Vessel's return to sea.

According to Jeskevicius, the Koreans rushed the repairs[18] that were being done to get the

Vessel back out to sea so that it could commence making money from its fishing catch.  He

surmised that the repairs that would be done would be just another patch job[19] until the Vessel

[13]DE 339-36, Exhibit 36, CV 11-00034.

[14]Section II.A.¶ 90-DE 153-8.  Email from Jeskevicius to Lee, dated 12-08-08.

[15]MARPOL, the International Convention for the Prevention of Pollution from Ships, is the main international convention covering prevention of pollution of the marine environment by ships from operational or accidental causes.

[16]Section II.A.¶ 91-DE 153-9.  Deposition of John Jeskevicius, dated 02-28-13.

[17]Section II.A.¶ 92-DE-153-10.  Jeskevicius letter to Unterberg, dated 12-02-08.

[18] DE 326-10, Exhibit No. H, CV11-00034. Deposition of Jeskevicius, pp. 82-83.

[19] Section II.A.¶ 94-DE 153-12.  Memo from Jeskevicius to Capt. Jill of Pacific Breeze, dated 12-29-08.

went back to the shipyard for yet another patch job.  Based upon all the considerations mentioned above, Captain Jeskevicius advised Unterberg that he would never return to the Vessel as its Captain  because the Vessel was unquestionably a "piece of crap."  Captain Jeskevicius did resign as Majestic Blue's Captain on December 27, 2008[20] and left the Vessel at Pohnpei in the Federated States of Micronesia (FSM) on January 5, 2009.[21]

Captain Douglas Pine, one of the Captains who succeeded Jeskevicius as Majestic Blue's Captain, experienced crew problems similar to those experienced by his predecessor.  He recorded in the Vessel's log books that there were serious safety issues in the engine room[22] spaces.

Captain Pine was succeeded by Captain Thomas Ridenour.  Ridenour assumed command of the Vessel in January, 2010, six months prior to its sinking in June.  Ridenour expressed great concerns about the condition of the ship.  During his depositions, he repeatedly stated that the Majestic Blue was "in a pretty bad condition."  Ridenour questioned the financial viability of repairing the Vessel because there was so much wastage of steel.  He further indicated that the Vessel was so old that in many ports of the world, a vessel older than twenty-five years would not have been allowed into the ports of New York and Amsterdam.[23]  The Majestic Blue did go into dry dock in China.  Ridenour also stated that both he and Unterberg recommended numerous times to Dongwon that the drydock take place in Korea, as their first choice, and the Subic Dry Docking in the Philippines as their second choice.  Despite their recommendations and concerns, management sent the Vessel to dry dock in China at the Longshan Shipyard.[24]  Ridenour stated that Korean Fishing Master, Chief Engineer, and Chief Mate were not happy going to China.  The Chief Mate who was the only person to have previously been to that shipyard said the place was terrible.  He described it as dirty,

---

[20]Section II.A.¶ 96-DE 153-14.  Memo from Jeskevicius to Unterberg, dated 12-27-08.

[21] Section II.A.¶ 97-DE 153-15.  Log entry by Captain Pine, dated 10-19-09.

[22]Ibid.

[23]Section II.A.¶ 103-DE 153-21.  Deposition of Ridenour, dated 01-18-13, p. 54.

[24]Ibid.  P. 67.

disorganized, Chinese, and shoddy.[25]

With management having made up its mind regarding the location of Majestic Blue's dry docking, Majestic Blue arrived at the Longshan Shipyard in March, 2010 to begin its biannual dry docking. Ridenour stated that it was Dongwon's policy that "a shipyard grid should take 23 days and cost $1.8 million" and did not take into consideration "the fact that different vessels have different ages, different sizes, and are in different states of repair." Ridenour, however, advised Dongwon that based upon the condition of the Majestic Blue, it would take 30 to 40 days to do the repairs. Dongwon replied that it would only take 23 days.[26]

Byeong Hyeok Lee, Dongwon's Assistant General Manager from its Busan office, confirmed that the company allocated approximately 20 to 25 days[27] for the dry docking of Majestic Blue at Longshan Shipyard. As is customary in the dry docking of Dongwon vessels outside of Korea, Lee and approximately 15 to 20 Korean technical experts, employees from an independent company, arrived at Longshan Shipyard to commence their respective assignments. Since the Majestic Blue was not owned by Dongwon, Lee stated he would have had to consult with Jurgen Unterberg[28] about repairs to the Vessel. The Korean skilled technicians who came would work on areas that the local shipyard would not be able to perform, such as the gyro compass, the radar, the sonar, and others.[29] These skilled technicians would be in charge of the repairs they made and would report to Lee. Lee supervised their work and would give orders for repairs, if necessary.[30]

General repair work[31] would be done by the local shipyard company and Lee would supervise their work. In addition to Lee, the local shipyard manager would assist in the

---

[25]*Ibid.* P. 88.

[26]Section II.A. ¶ 102-DE 153-20. Ridenour deposition, p. 427.

[27]Section II.B. ¶ 93-DE162. Lee deposition, p. 33.

[28]I*bid.* P. 29.

[29]*Ibid.* Pp. 24 and 27.

[30]*Ibid.* P. 26.

[31]*Ibid.* Pp. 24 and 28.

supervision.  General repair work would include repairs to the rudder, steering gear, propeller, and shaft.  Lee stated that all work performed on the Vessel was inspected by the local shipyard manager and then he along with the local manager would make a joint inspection.  All work performed by the local shipyard employees were accepted by him.

Lee in his deposition also stated that the rudder assembly went through its normal inspection-disassembly-and re-assembly and all work done there was approved by him.  After the rudder re-assembly was completed, the rudder was subjected to the swing test and the resultsof the swing test and timing test were good.[32]  The swing test was also performed on the rudder when Majestic Blue was put back in the water and the results were also good.[33]

Lee explained that the dry dock time at Longshan was a little over 40 days and was longer than the average 20 days, because there were a lot of additional repairs that had to be performed on the Vessel based upon the request from the captain of the ship as well as Unterberg.[34]  The additional repairs included a "whole plate renewal as well as the renewal of the plates inside the tank."  The plates needed to be replaced because "the thickness was not thick enough."  Corrosion from moisture or electrical corrosion could have caused the thickness to decrease.[35]  Lee stated that the corrosion on the Majestic Blue when compared to the average Vessel that went into dry dock was "not that large in particular."[36]

Lee further stated that all requests for repairs to the Vessel which were made by Captain Ridenour were accomplished at the Longshan Shipyard dry docking.  He did not need to get approval for the repairs requested by Ridenour because they were not major repairs.  Lee also said there were no change orders made during the dry dock.[37]

Finally, Lee said that there was no pressure from the main office to speed up the

---

[32]*Ibid.*  Pp. 63-64

[33]*Ibid.*  P. 68.

[34]*Ibid.*  P. 97.

[35]*Ibid.*  P. 98.

[36]*Ibid.*  P. 99.

[37]*Ibid.*  P. 101.

Longshan dry docking in the interest of returning the Majestic Blue to the sea for fishing.[38]

The Majestic Blue left China and headed to Guam. When the ship came to Guam there were several more repairs that were made to the Vessel. Jurgen Unterberg explained that they ran out of time to make all the repairs they wanted to do at the Longshan Shipyard since another ship was already coming in for dry docking[39] and thus, the Vessel had to leave for Guam to complete the repair work. Unterberg described these additional repairs as "afloat repairs" and that most of these afloat repairs[40] were done in Guam. Unterberg also stated that when the Vessel came to Guam, he subjected the Majestic Blue to Coast Guard inspection even though he was not required to do so.[41]

With regard to the additional repairs that needed to be made, Unterberg stated that Pacific Welding was contracted to do welding because "they have Coast Guard – or ABS approved welders who could weld on ships" and they did some of the repair work that was not done at the Longshan drydock. Unterberg described the work performed by Pacific Welding as basically metal work, mostly welding.[42]

Unterberg further stated that the Coast Guard wanted them to "weld on a water tight door and get a new hydrostatic release for the EPIRB." He stated that these were some of the repairs he wanted to have done in Longshan that was not done. He described the watertight doors he wanted fixed as being two doors. One watertight door was located in the shaft alley tunnel by the entrance to the engine room and the other was located on the opposite end of the tunnel by the entrance to the steering gear room. He stated he wanted work done on the watertight doors because he was not happy with the thickness of the bulkhead. Unterberg further explained that when he stated that the Coast Guard wanted them to weld on the watertight doors, it was really Unterberg telling the Coast Guard to put this item of repair on its

---

[38]*Ibid.* P. 100.

[39]Section II.B. ¶ 35- DE 154. Unterberg deposition, p. 43.

[40]*Ibid.* P. 293

[41]*Ibid.* P. 53.

[42]*Ibid.* P. 319.

list.[43]

The fact that there was welding work done in Guam signifies that type of welding skills that were unavailable at the Longshan Shipyard.

Commenting on the standards of welding at the Longshan Shipyard, Ridenour stated that B. H. Lee, the attending project manager for Dongwon at the Chinese dry dock, required the Chinese workers to redo numerous welds. The welders had to "take the plate out and redo the welding because the welding could not pass the dye test." He further stated that the welders in China were not certified, the machine shop was not very good, and the quality of work that the welders did was not very good. Ridenour also stated that the amount of work that the workers "had to do was way beyond the scope of the abilities of the shipyard."[44]

An area of work that was performed in Guam dealt with the rudder packing gland. As part of his efforts to determine the scope of yard that was actually done at Longshan and the amount of work that still needed to be done in Guam, Unterberg looked at the "rudder shaft packing" and also the "propeller shaft packing." In looking at the rudder shaft packing, he found that "the condition was the cool water flow, ... was a little too high." He stated that such a condition was not bad, but at the same time it was not good.[45]

In his deposition, Unterberg explained that work was done with respect to the rudder packing gland at the Longshan dry dock because it was part of the overall planned maintenance that is involved in a biannual dry docking. Packing in vessels generally last between 18 to 24 months and are automatically replaced during the biannual dry dock.[46] Unterberg describes the process as basically pulling the rudder out and checking the rudder post and rudder shaft. If everything is fine, you "put it back in and repack it."[47] He described his part with regard to the inspection of the rudder packing gland and the rudder system at Longshan as the final testing of

[43]*Ibid.* Pp. 327-328.
[44]Section II.A.¶ 103-DE 153-15. Ridenour deposition.
[45]Section II.B. ¶ 35-DE 154. Unterberg deposition, p. 45.
[46]*Ibid.* P. 35.
[47]*Ibid.* P. 34.

the rudder while the boat was still up in dry dock.  Testing at the dry dock was to make sure that the rudder moved freely from "hard left to hard right" within a certain time frame.[48]  Unterberg stated that the rudder moved very smoothly.  Unterberg left Longshan before the Vessel could be put into the water to perform the swing test.  Lee, who supervised the China dry dock work, performed the swing test when the Vessel was put in the water and he stated that the results of the test were good.

In light of the repairs that were made to Majestic Blue while in dry dock at the Longshan Shipyard and the additional repairs that were made in Guam, Captain Thomas Ridenour stated: "I found the boat to be seaworthy when we left China and more so when we left Guam on its last voyage."[49]  Ridenour found the Vessel to be seaworthy when it left China because of the structural work that was done on the Vessel at the Longshan Shipyard.  "I always maintained that the boat was seaworthy at the time we left China."  When asked what he meant by seaworthy, Ridenour responded:  "'Seaworthy' means the vessel was sound to complete the voyage that we embarked upon."[50]  When asked why he believed that the Vessel was more seaworthy when it left Guam on its last voyage, Ridenour replied that the Coast Guard required that extra work be done with regard to "the two watertight bulkheads, one in the aft steering room and one in the beginning of the shaft alley" because the doors did not seal after a chalk test had been performed.  Pacific Welding came in and put in "different frame members and they reworked the doors."[51]

Ridenour further described seaworthiness of a vessel as a relative thing.  A "vessel can be seaworthy today and not seaworthy tomorrow."[52]  Something could happen to the vessel. "Obviously, when it sunk it wasn't seaworthy.  But when we left Guam, I thought the vessel was

---

[48]*Ibid.*  P. 38.
[49]Section II.B. ¶ 95-DE 164.  Ridenour deposition, 02-18-13, p. 410.
[50]*Ibid.*  P. 411.
[51]*Ibid.*  P. 412.
[52]*Ibid.*  P. 412.

seaworthy to make the voyage from China to Guam."[53]

As the Majestic Blue sailed from Guam on its last voyage, Claimants contend that the Vessel was not seaworthy while Petitioner contends that it was. Claimants also contend that the Vessel was not seaworthy because of the inadequacies of its crew.

The Majestic Blue set sail from Guam on May 21, 2010 with the following crew members[54]:

|     | Position           | Name               | Country     | Age |
|-----|--------------------|--------------------|-------------|-----|
| 01  | Captain            | David Hill         | U.S.        |     |
| 02  | Fishing Master     | Seok Jeon Yong     | South Korea | 43  |
| 03  | Chief/First Officer| Bong Soo Kim       | South Korea | 41  |
| 04. | 2nd Officer        | Sungil Shin        | South Korea | 38  |
| 05. | 3rd Officer        | Minkeum Cha        | South Korea | 19  |
| 06. | Chief Engineer     | Chang Cheol Yang   | South Korea |     |
| 07. | 2nd Engineer       | Moosub Keum        | South Korea | 36  |
| 08. | 3rd Engineer       | Herman Wattimena   | Indonesia   | 26  |
| 09. | Radio Officer      | Namyong Bak        | South Korea | 49  |
| 10. | First Oiler        | Dahee Man          | South Korea | 38  |
| 11. | Oiler              | War Jani           | Indonesia   | 20  |
| 12. | Oiler              | Rolly L. Viejo     | Philippines | 29  |
| 13. | Cook               | Kyehoon Cho        | South Korea | 39  |
| 14. | Reefer Engineer    | Joseph P. Navarro  | Philippines | 37  |
| 15. | Electrician        | Ricky P. Say       | Philippines | 26  |
| 16. | Electrician        | Randelito Avenido  | Philippines | 32  |
| 17. | Boatswain          | Cheol Su Kim       | South Korea | 53  |
| 18. | Deck Man           | Ha Ding Dan        | Vietnam     | 24  |

---

[53]*Ibid.* P. 413.

[54]See collectively Petitioner's Exhibit Nos. 40 through 88, *supra*, all part of DE157.

| | | | | |
|---|---|---|---|---|
| 19. | Deck Hand | Michael G. Nebres | Philippines | 29 |
| 20. | Deck Man | Cong Van Nguyen | Vietnam | 31 |
| 21. | Deck Hand | Jomar F. Rusia | Philippines | 26 |
| 22. | Deck Hand | Syafril | Indonesia | 31 |
| 23. | Deck Hand | Rolando L. Viejo | Philippines | 32 |
| 24. | Observer | Ellis Taleu Jr. | Palau | 54 |

There were twenty-three (23) crew members on board the ship plus one observer. Of the 23 crew members, one (1) was from the United States, 10 were from South Korea, seven (7) were from the Philippines; three (3) were from Indonesia, and two (2) were from Vietnam. The observer was from Palau. They ranged in ages from 19, Minkeum Cha who was the 3rd Officer to 54, Ellis Taleu, the observer. Twenty-one of the 24 persons on board were part of the crew that made the voyage from China to Guam. In Guam, Captain Hill, Michael Nebres, and Ellis Taleu joined the rest of the crew.

While the Majestic Blue was a U.S. flagged vessel, Majestic Blue did not require Dongwon to provide it with an English speaking crew. But according to Unterberg, "...usually the important people all spoke English."[55] As to those crew members in Guam that he was familiar with, he stated that Fishing Master Seok Yeon Yong spoke some decent English, and Chief Officer, Bong Soo Kim, spoke very good English.[56] Boatswain, Cheol Su Kim, did not speak English, and Deck Man, Cong Van Nyugen, spoke some English.[57] Second Engineer, Moosub Keum, spoke "not too good English", Third Engineer, Herman Wattimena, spoke pretty good English, Reefer Engineer, Joseph P. Navarro, spoke some decent English, Deck Hand, Jomar Rusia, spoke pretty good English, Deck Hand, Syafril, spoke some decent English, Deck Hand, Rolando Viejo, spoke decent English, and Electrician, Randelito Avenido, spoke good English.[58] Radio Officer, Namyong Bak, spoke fairly good English, Oiler, War Jani, spoke

---

[55]Section II.B. ¶ 35-DE 154. Unterberg deposition, p. 274.

[56]*Ibid.* P. 269-271.

[57]*Ibid.* P. 271.

[58]*Ibid.* P. 272.

some English, and Observer, Ellis Taleu, Jr., spoke fluent English.[59]

When asked what languages some of the crew members spoke, Wattimena stated that Ellis Taleu, Jr. "normally use English" and that he never heard him speak any other language.[60] Michael Nebris spoke English. Fishing Master Seok Jeon Yong spoke English when speaking to the captain and he spoke Korean when speaking to the rest of the crew. He also could speak a "little bit" of Indonesian. Chief Officer Bong Soo Kim spoke Korean when speaking to Koreans but "can speak English and ... also knows Indonesian."[61] Wattimena did not know whether Second Engineer Moosub Keum spoke English but that he "spoke to me in mixed English and Korean."[62]

With regard to Chief Engineer Yang, Wattimena stated that he could speak English but that he mainly spoke Korean on board the ship. He said that he heard Yang speak English during meetings and when assigning jobs.[63] When asked earlier in his deposition whether the Chief Engineer spoke any other language, Wattimena stated that he did not. However, when asked if the Chief Engineer spoke English, he replied: "Yes, little bit."[64]

Ridenour described the Fishing Master's English as "adequate, not great" and Wattimena as speaking "pretty good English."[65] However, he stated that Radio Officer, Namyong Bak, "couldn't speak English."[66]

While Unterberg said that War Jani, an Indonesian, spoke some English, Herman Wattimena, also an Indonesian, stated that War Jani did not speak English, but did speak Korean. Similarly, Unterberg stated that Syafril, the other Indonesian, spoke decent English, but

---

[59] *Ibid.* P. 272.

[60] Section II.B. ¶ 89-DE 158. Wattimena deposition, pp. 59-60.

[61] *Ibid.* P. 60.

[62] *Ibid.* P. 62

[63] *Ibid.* P. 61

[64] *Ibid.* P. 47.

[65] Section II.B. ¶ 95-DE 164. Ridenour deposition, pp. 445-446

[66] *Ibid.* P. 442

Wattimena stated that Syafril also did not speak English, but did speak Korean.[67] Wattimena, however, appears to corroborate Unterberg's statement regarding Second Engineer Moosub Keum's proficiency in English stating that Keum spoke to him in "mixed English and Korean".[68]

Wattimena is described by Ridenour as speaking pretty good English and this description is similar to what Unterberg stated. Ridenour also corroborates Unterberg's statement regarding the Fishing Master's proficiency in English describing Seok Jeon Yong's English as adequate but not great.[69] Contrary to what Unterberg said that the Radio Officer spoke fairly good English, Ridenour stated that Namyong Bak could not speak English.[70]

The inability of the Radio Officer to speak English was of grave concern to Ridenour.

> I am going to say this for about the 5th time now and will have no trouble telling Mr. Hwang personally when I see him. It is not wise to have a r/o with zero English language skills. It is not safe and makes me seriously consider not going back to sea on the vessel until the situation is corrected. I forsee problems with filing the proper reports with FFA and NOAA and It places ou[r] fishing license at risk....[71]

In his deposition, he noted:

> [I]t's an international requirement by the IMO that every vessel at sea have somebody who speaks English on the bridge. The most likely- the most logical person to speak English is the radio officer who is doing the majority of the communications. And if I have to rely on somebody to do emergency communications, I would hope they would have proficiency in English, which is the international maritime language.[72]

In his email to Unterberg, he wrote:

> In any case, having a r/o who doesn't even understand 'send e-mail' or 'please print this' is going to be a disaster....He probably knows fishing and electronics inside out but if he can't speak English then he doesn't belong on a U.S. flagged vessel. It will place additional burdens on the

---

[67]Section II.B. ¶ 89-DE 158. Wattimena deposition, p. 61.

[68]*Ibid.* P. 62.

[69]Section II.B. ¶ 95-DE 164. Ridenour deposition, p. 446.

[70]*Ibid.* P. 442.

[71]Section II.A.¶ 13-DE 133-6. May 10, 2010 email from Ridenour to Unterberg.

[72]Section II.A.¶ 34-DE 133-27. Ridenour deposition of 01/18/13, p. 203

> Chief Officer, who speaks English to help out with the reports....I specifically e-mail Mr. Hwang months ago telling him how important it was for the r/o to speak English and would he please make it hiring criteria. I can dig out the email and show you if you like. This is just another example that they frankly don't give a shit what we think or else they fail to understand that this is a U.S. flagged vessel.[73]

Because of language barriers, Captain Hill's ability to communicate with his crew or to have his orders obeyed were severely hampered because he only spoke English and only about a third of his crew were able to speak in English. Most of the crew spoke fluent Korean or were able to speak Korean, a language Captain Hill did not understand or speak. If he were to give an order, it would have to be in English and would simply have to rely on a Korean Officer to make sure that his orders were properly and correctly translated. During the voyage all communications and announcements were made to the crew in Korean. The Fishing Master, the Chief Officer, and Chief Engineer all spoke Korean when addressing the crew. Most importantly, when water was gushing in through the steering gear room and the Chief Engineer decided the ship was not safe, he ordered abandonment of the ship in the Korean language.

The Majestic Blue, as well as the Pacific Breeze, were described by Ridenour as ships that were treated as "training vessels." All the Korean crew members which made up the crew in Guam had been recently promoted to their new positions.[74] They had many years of experience, but were newly promoted and had not yet jelled together as a crew. "They could be expected to make a bunch of false steps, some of them bumble their way through, but at the end of 18 months they would be like a well oiled machine, like any crew."[75] Thus, for all of the crew members from South Korea who were recently promoted to their new positions, their voyage on board the Majestic Blue which began in Guam on May 21, 2010 was their first experience in their promoted positions.

Thus, when the Majestic Blue set sail from Guam, it was composed of a crew that had never before sailed together.

---

[73]*Ibid.* Ridenour email to Unterberg of May 10, 2010, pp. 7-8 of exhibit.

[74]Section II.B. ¶ 95-DE 164. Ridenour deposition, p. 443.

[75]*Ibid.* P. 444.

As to Captain Hill, this was his second tour of duty as Captain on board the Majestic Blue. As to Fishing Master Seok Jeon Yong, this was his first time sailing as a Fishing Master.[76] As to Chief/First Officer Bong Soo Kim, this was also his first time sailing as a Chief/First Officer. As to 2nd Officer Sungil Shin, this was the first time he sailed as a 2nd Officer on board a vessel. As to 3rd Officer Minkeum Cha, this was also the first he sailed as a 3rd Officer.

As to the engineers on board Majestic Blue, this was also the first time Chief Engineer Chang Cheol Yang[77] served as a Chief Engineer. Similarly, this was also Moosub Keum's first experience as a Second Engineer on board a tuna seine vessel. The newness of the crew to their positions was not surprising since Majestic Blue was used as a training vessel by its owner. As the vessel departed Guam on May 21, 2010, its officers and engineers lacked experience in their occupied positions.

As to Captain Hill, Ridenour stated in his first deposition that Unterberg did not want Captain Hill to return as the vessel's master. When asked why Unterberg allowed Hill to return as the ship's captain, Ridenour stated:

> He said Dongwon would not agree to terminate his contract even though it was a contract at will because they were afraid there might be a potential lawsuit, that David might sue them for some reason, and part of Jurgen's reason that he didn't want to bring David back, because I told him that David wasn't competent based on what I had observed when I took the ship over from David.[78]

Ridenour also stated that he thought Hill was a danger to the ship and the crew.[79]

The crew of the Majestic Blue, except for the Captain, were recruited and staffed by individuals chosen by Dongwon pursuant to its manning agreement with Petitioner. Ridenour, however, opined, that it was customary for the Fishing Master to hire his friends for positions

---

[76]The Fishing Master had sailed as the number two guy for twenty years. See Section II.B. ¶ 95, DE 164, Ridenour deposition, p. 443.

[77]It was Yang's "first shot at being chief engineer before he was first assistant engineer." See Section II.B. ¶ 95, DE 164, Ridenour deposition, p. 443

[78]Section II.A.¶ 10, Ridenour deposition, p. 283.

[79]*Ibid.* P. 353.

within the vessel that he was Fishing Master of.

In Ridenour's email of April 23, 2010 to Hill, he said:

> Here is the good news; you are getting a very good crew. I got along ok with the last group but this is a better bunch. The new Fishi[n]g Master is great. Very friendly and considerate. The new first officer is one of the best mariners that I have seen from Korea. He is a great help w[i]th all of the USCG requirement and speaks English well. He is concerned ab[o]ut you and I..... Things are looking up! You will be surprised when you get bac[k] on board.[80]

During his deposition, Ridenour was asked to assess the performance of the crew as a whole. As the captain of the vessel, he stated that he was more readily able to assess his supervisors than those in the bottom of the chain command. He thought the fishing master was highly competent. He also said he worked previously with "third engineer, Herman" and got to be pretty good friends with him. He could get straight answers from him and was "impressed with his technical competence, and his honesty, and forthrightness....[81] Ridenour also stated:

> So, I formed good opinions of the fish master, chief engineer and the third assistant engineer. The first assistant engineer was an alcoholic. It was obvious from day number one that he couldn't stay off the sauce. I either went to the chief engineer or the third assistant, because the first assistant, was, you know...[82]

By process of elimination, the court finds that the referenced "alcoholic" crew member was Second Engineer Moosub Keum. He was the engineer below the chief engineer and above Herman Wattimena, the third engineer.

In his depositions, Ridenour described the efforts made by Dongwon in relation to the repairs at dry dock as well as to the employment of the Korean crew members as profit motivated. He surmised that if the vessel was not engaged in fishing, it was losing $30,000 to $40,000 a day. The Korean officers' motivation "was to make money. The Korean chief and the fish master and the chief officer - all the Koreans got paid as a percentage of the catch. So they wanted to catch as many fish as they can, under any circumstances that they could catch them." He described an ongoing battle to keep them (the Korean crew) from setting the net on

---

[80]Section II.B. ¶ 36-DE 154. Exhibit 2, email from Ridenour to Hill, pp. 125-126.
[81]Section II.B. ¶ 95-DE 164. Ridenour deposition, pp. 445-446.
[82]*Ibid*. P. 446.

whales since using the whale as a fish attraction device was illegal.  They would reply that they had not set the net on the whale, "but how did the whale get in the middle of the net if you didn't set on it."[83]

Ridenour further stated that it was "an ongoing battle to try to get cooperation from the Korean officers.  They viewed my presence as simply a matter of necessity in order to maintain the American fishing license" and to be able to fish in all the countries without obstruction, referring to 13 un-named countries.  "I was just a necessary evil, somebody to sign paperwork."  He stated that wasn't the way it worked on an American vessel.  Working on the Majestic Blue, "I had complete liability with limited authority."[84]

Ridenour was willing to accept liability but only if he had the authority to make the decisions.  He stated that he tried to have people fired and replaced but was stonewalled by Korea.  If anything went wrong, he would have all the liability.  However, for the Koreans on board, if anything went wrong, they would just move on to another Dongwon boat.  "And that was my frustration for three years on both vessels of having all the responsibility, all the liability and none of the authority."[85]

When asked if the crew kept anything from him, Ridenour stated that the Indonesian and Filipino crew members were good in informing him about things that were going on below.  "But the Koreans didn't want to disclose problems to me because every day lost from fishing is a loss of 30 to $40,000.  So their jobs as engineers was to keep the boat fishing, keep it producing fish."  On many occasions, Ridenour was shown by the Indonesian and Filipino crew members cracks in plumbing, cracks in the hull, and cracks in frames.  The crew members told Ridenour not to tell the Chief Engineer that they had told him about the cracks because they did not want to get into trouble with the Korean chief.[86]

The extent of the American captain's authority on board the Majestic Blue has been

---

[83]Section II.A.¶ 103-DE 153-21.  Ridenour deposition, dated January 18, 2013, p. 112.
[84]*Ibid.*  P. 110.
[85]*Ibid.*  P. 111.
[86]*Ibid.*  Pp. 111-112.

documented in other incidents in relation to other captains of the Vessel. As was noted above, Captain Jeskevicius resigned his position as captain of the Majestic Blue for the same liability issues that Ridenour complained about. Jeskevicius noted that the Korean officers were dumping trash bags into the ocean despite MARPOL ANNEX V requirements. "[T]he senior officers saw fit to create a situation that could jeopardize my license and severely limit my ability for employment." Jeskevicius stated that he could not "trust these people, the bottom line is that they knew exactly what they were doing" and if he were faced with "another compromising situation that places my license in jeopardy I will resign this position."[87] Jeskevicius' experience with the senior officers regarding "waste management practices" led him to comment that he had "more respect for the Indonesian and Philippine crew than I have for the Koreans."[88]

Douglas Pine, an American Captain on board Majestic Blue, made an entry on August 30, 2009 in the vessel's log book that the fishing master "assaulted me by striking me with an open hand when I attempted to shake hands with him."[89] An entry on the vessel log the next day, August 31, 2009, showed that Pine delivered a letter to the fishing master "discussing important concepts such as communication and trust." Pine had the fishing master read and sign the letter which indicated the captain's expectations of the fishing master's "understanding and acceptance of my lawful authority as master of this vessel. I sincerely hope that the worse is behind us now that we've established who actually runs this show."[90] Pine alleged in an entry on October 19, 2009, that "the Korean officers of my ship have been while under my command in daily violation of Marpol ...Annex V in that they routinely dump category (plastic) garbage at sea." Pine knew that the Korean officers purposely violated the waste management plan because he saw an officer dumping trash right in his presence without any hesitation on the part of the Korean officer. When Pine asked the First Assistant Engineer why they did that, he

---

[87]Section II.A.¶ 90-DE 153-8. Jeskevicius email to Sam Lee.
[88]Section II.A.¶ 93-DE 153-11. Jeskevicius email to Unterberg
[89]Section II.A.¶ 97-DE 153-15. Pine entry on log book, p. 51
[90]*Ibid.* P. 52.

replied: "Capt. Mark no care, why you care... I have personally witnessed on many occasions the entire complement of officers and unlicensed seamen of the Majestic Blue violate Marpol... and CFR's by disposing of plastic waste at sea."[91]  Despite providing the fishing master the letter referenced above, Captain Pike noted that the fishing master refused his lawful order to arrive at Tarawa for a vessel inspection by the U. S. Coast Guard before the inspection date.[92]

It appears that the crew's respect for the Captain's authority on board the Majestic Blue became such a serious issue that it prompted Unterberg to send an email to Majestic Blue's crew advising them of the nature of the command structure on board a U.S. flagged purse seiner and their duty to obey the orders of the Captain.  In the email, dated May 5, 2010, he stated:

> To all Officers, Engineers, and Crew aboard the Majestic Blue,[93].
>
> ...
> It was brought to my attention that Korean Officers and Engin[e]ers do not seem to understand the Command Structure aboard a US flagged Purse Seiner!
>
> US regulation clearly state that the Captain is the sole Officer in Charge of a Purse seiner as well as any US Vessel.
>
> This means that if the Captain gives and order to anyone from Fishing Master on down to the lowest rank, this order will and must be obeyed with out discussion and hesitation!...
>
> A vessel is operated not by voting on a certain issue, but by strict ob[e]dience of orders from the Captain to Officers and engineers and to crew members or by Officers to lower ranking officers and crew members.  This is to ascertain that in certain emergency situation a clear chain of command ex[i]sts and orders from this chain of command are obeyed!
>
> The Fishing Master is considered a[n] officer with special knowledge which as his rank states is fishing operations!  He is therefore in charge of fishing operations but is not in charge of the vessel herself which at all times is the responsibility of her Captain.  Of course a Captain will cooperate with a Fishing Master during Fishing operations as the purpose of this vessel is to catch fish!...  Such my orders, after having explained the chain of command of this Fishing Vessel are: Every Officer, Engineer and Crew Member must obey the Captains orders without question!

---

[91]*Ibid.*  Pp. 63-64.

[92]*Ibid.*  P. 65

[93]Section II.A.¶ 120-DE 153-38.  May 5, 2010 email from Unterberg addressed to officers and crew of Majestic Blue sent to Dongwon.

Every Officer, Engineer and Crew member who is aware of any dangerous or potential dangerous situation or operation wise must immediately inform the Captain relative to such matter....

This orders will be enforced if necessary under the laws of the United States. I am sure you all understand that this standing orders are necessary and I am sure that all of you also understand that they are valid ... that all of you beingeducated and good seafaring men will comply with this orders at all times!

Captain Jurgen Unterberg, Ph.D,MES, EES
General Manager, Majestic Blue Fisheries, LLC

At the time Unterberg sent the May 5, 2010 email to Dongwon, the Majestic Blue was in drydock at the Longshan Shipyard facility in China and was preparing to set sail to Guam. It sailed on May 7 and arrived in Guam on May 13.

As noted above, the Majestic Blue underwent several more repair work while it was afloat in Guam. More importantly, it underwent Coast Guard inspection. The vessel's dockside examination by the Coast Guard commenced on May 17, with follow up examinations on May 19 and May 20, 2010. On May 17, the Coast Guard inspected eight (8) systems. Two systems, the "Pollution Prevention/Response" and "Personnel" were inspected satisfactory. Six systems were found deficient and later corrected. These systems include: Operations/Management, Navigation, Lifesaving, Fire Fighting, Construction/Loadline, and Communications.

One of the vessel's systems that was found deficient dealt with the watertight door by the steering room. The Coast Guard noted:[94] "Make aft steering water tight door water tight, knife edge wasted."

Another deficiency noted by the Coast Guard related to drills. The crew needed to satisfactorily pass fire and abandon ship drills. The fire drill conducted on May 17 was, however, unsatisfactory and due to that failure the Captain requested that the abandon ship drill be conducted during a follow up examination.

On May 17, the Coast Guard also: "Noted rudder packing gland was leaking excessively

---

[94]Section II.B. ¶ 38-DE 157 Exhibit A. Page 3 of Coast Guard Activity Summary Report

when moving the rudder, issued worklist item to correct."[95]

The Coast Guard returned for a follow up examination on May 19 and witnessed a satisfactory completion by the crew of the fire drill. The crew also performed a satisfactory abandon ship drill. All the "crew arrived with Type-1 PFD's and required safety equipment per muster call."[96]

As to the excessive leak of the packing gland, the Coast Guard noted:

> Rudder still leaking at packing when operated. Per vsl rep(s), small amount of water is normal for that type of old packing/bearing. To be further adjusted and will check w/CWC as to original condition...[97].

The Coast Guard returned for another follow up examination on May 20. Upon "entering the shaft alley from the lower mach space to re-check the steering space WTD", it noted oily bilge water in the shaft alley bilge and the smell of diesel fuel. The oil in the bilge and diesel leak was not present during the prior day follow up examination. The Coast Guard asked the vessel representative and the Captain where the oil in the bilge came from since there was no internal combustion machinery in the shaft alley. "Neither at first acted like they noticed the oil when shown," and neither one had an answer. The vessel representative and Captain were told to identify the cause of the leak and have it repaired. The Coast Guard representative came later on the afternoon and was told by the Captain that a "loose bolt/nut was found on the *bhd* shaft seal plate which allowed bilge water from the mach space bilge to leak thru the bolt hole."[98]

With regard to the leaking packing gland, the Coast Guard reported:

> Rudder packing still leaking while swinging the rudder. Called CID to attend vessel to get second opinion. Upon CID arrival, swung rudder and discussed with vsl rep(s) and Master. Vsl rep(s) stated it worked fine on the voyage from China to here. All agreed that rudder packing is to be monitored daily by U.S. Master and report to the Guam vsl reps office if leak gets worse.[99]

---

[95]*Ibid.* P. 4.

[96]*Ibid.* P. 5.

[97]*Ibid.* P. 5.

[98]*Ibid.* P. 6.

[99]*Ibid.* P. 6.

In its next to last entry in its narrative summary report, the Coast Guard reported:

> Reminded/discussed with US Master that he is responsible for the safety of the crew and vsl. Including but not limited to: ensuring all lifesaving/firefighting equipment and crew training are maintained; safe operation, navigation, stability, watertight and structural integrity of the vessel is maintained; and that occupational safety and all environmental laws (oil, garbage,) are followed.

The final entry on the Coast Guard report was dated May 21, 2010. It stated: "Rcvd phone call from Guam vsl rep. He rcvd his 1st report from the vsl and the Master stated that the rudder is not leaking."[100]

As the Majestic Blue sailed away from Guam on May 21, it was clear that the Coast Guard wanted the rudder packing to be monitored daily by Captain Hill. In response to the Coast Guard concerns as well as his own and that of Captain Ridenour, Unterberg issued an order to Hill that he personally monitor the rudder stock on a daily basis. The appropriateness of the order to Hill was raised in Shortall's deposition. When Shortall was asked whether this type of order which came from the General Manager to the Vessel's captain was customary, he replied: "It would be unusual to see the Managers instructing the Master to check the packing on the rudderstock, because I would expect that normally to be the engineering staff's area of expertise."[101] Regardless of the nature of the order, Hill sent back reports to Unterberg on the condition of the packing gland in his daily noon reports.

Was the excessive leaking of the packing gland that was a concern to the Coast Guard resolved when it left port in Guam? It is Petitioner's position that it was resolved. In his deposition, Unterberg suggests that the excessive leak that was noticed by the Coast Guard was corrected before the vessel left Guam. However, in its activity report, the Coast Guard reported on May 20, 2010, that the packing gland was still leaking. The court notes that the initial worklist compliance order was to correct a rudder packing that was leaking excessively. If the Coast Guard reported that the rudder packing was still leaking, it necessarily and logically meant that the excessive leak had not been corrected. The vessel representative advised the Coast

---

[100]*Ibid.* P. 6.
[101]Section II.B. ¶ 37-DE 155-1. Shortall deposition, p. 60.

Guard duty officer that the leak was normal for that type of old packing/bearing. The Coast
Guard duty officer then called a supervisor to get a second opinion. A rudder swing test was
performed. The vessel representatives advised the Coast Guard representatives that the rudder
packing worked fine during the voyage from China to Guam. Based upon those statements, the
Coast Guard allowed the vessel to leave Guam with the agreement that the rudder packing was
to be monitored daily by the vessel Master.[102]

Captain Ridenour was asked in his deposition whether he checked the rudder packing
gland on a daily basis on the voyage to Guam. He answered "yes."

> Q. Okay. And what did you observe?
> A. I observed that it continued to leak more and more as the packing gland
>     wore in and I knew we'd have to tighten it up.
> Q. Okay. And it was a brand new packing gland?
> A. Yes. Uh-huh.
> Q. So, was that unusual to see?
> A. No, it's absolutely normal that a new packing gland has to be
>     retightened frequently in the first three, four, five months that
>     average placed in the boat- -[103]

When asked about the packing gland leak in Guam, Christopher Shortall stated that the
"packing was probably not tightened down correctly or fully at the time of the departure from
the shipyard, which wouldn't surprise me, because it needs to be nipped down, and as it works,
you need to nip it down more to maintain the correct leakage."[104] When further asked his
opinion whether the gland ever stopped leaking, he replied that as far as he knew, it did not. "It
was leaking normally and then there was no comment the actual condition had changed, so I've
no reason to doubt that it had changed."[105] He further said that if you have it too tight, it would
dry out and burn.

As pointed out above, Captain Hill was personally required to check out, at least daily,
the steering gear rudder shaft packing gland. If there were small changes in the water flow, he
would ask the Chief Engineer to deal with it. If there were "abnormal changes," he was to email

[102]Section II.B. ¶ 38-DE 157 Exhibit A. Page 6 of Coast Guard Activity Summary Report
[103]Section II.A. ¶ 101-DE 153-Exhibit 19 - Deposition of Thomas Ridenour, p.285.
[104]*Ibid.* P. 165.
[105]*Ibid.* P. 168.

or call Unterberg.[106]

In his first noon report May 21, 2010, Hill reported that the "Rudder post is not leaking any more than at dock." He reported on the status of the packing gland in his noon reports up until June 1, 2010. Most of the other noon reports indicated that the "rudder packing was ok," with the exception of the May 24, 2010 noon report in which he stated that it was still leaking about the same.[107]

On June 1, 2010 Hill reported to Unterberg in his daily noon report: "Rudder packing ok." In response to the June 1, 2010 noon report, Unterberg "ADVISED Capt. that rudder packing should be checked periodically but only to report if anything changes."[108] Hill continued to send noon reports to Unterberg but none of the succeeding noon reports ever made reference to the condition of the packing gland. The last noon report was received by Unterberg on June 14, 2010 the day of the sinking of the vessel.

As he left Guam on the Majestic Blue, Captain Hill was also reminded by the Coast Guard of his responsibility for the safety of the crew and the vessel. He had to maintain a safe operation of the vessel, and more importantly, the "watertight and structural integrity of the vessel." Unlike the standing order from Unterberg to Hill to monitor the rudder shaft packing gland, there was no order from Unterberg to Hill to keep the watertight doors closed when not in use.

Jeffrey Fischer was asked which member of the crew was in charge with enforcing policies regarding watertight doors in the engine rooms, he replied:

> Well, the ultimate responsibility falls back on to the captain, and it's his responsibility to make sure that the watertight integrity is maintained in the ship. So he can delegate that responsibility to the chief engineer to ensure that the watertight integrity is being maintained; however, that doesn't eliminate him from still taking action to ensure that it's being done himself.[109]

---

[106]Section II.A.¶ 9 -DE 100-9, Exhibit I - Daily Noon Reports.

[107]*Ibid.*

[108]*Ibid.* See notation on June 1, 2010 noon report.

[109]Section II.B. ¶ 98-DE 167. Jeffrey Fischer deposition, pp. 133-134.

On June 14, 2010, an alarm went off in the vessel while the Majestic Blue was at sea. Second Engineer, Moosub Keum, was on duty schedule from 12:00 to 14:00 when the alarm sounded.

> [W]hile on duty at about 13:20, I was inspecting the boiler room (including the steering room) and inspecting the shiplog in the watch room. At about 13:30, the alarm went off and when I checked the panel, I saw that the unit 2 alarm lamp was lit. While heading to the steering room, I saw that sea water was flowing in and when I reached the steering room, I found that large amounts sea water was flowing in because 6 RUDDER POSTS were damaged. I wanted to immediately report my findings to the chief engineer and go to the steering room together for verification but entry into the steering room was impossible due to the large amount of sea water that had flowed into the tunnel. After that, the chief engineer, in consideration of the wheelhouse situation and the amount of water that had flowed in, reported through the ship's broadcast microphone that the ship may have to be abandoned.[110]

Randelito C. Avenido, an electrician, wrote in his statement.

> [O]ur second engineer told us that the water came from steering room, from the rudder shaft. I go down and I saw the water on the tunnel already on very high level. And immediately our chief engineer call all engine personnel to go to watch room. And when we were in the watch room he said....to us That we have to go and prepare for abandon. At around 13:40 hours we transfer to skiff boat and net boat and leave the ship...[111]

Joseph P. Navarro, a Reefer Engineer, recalled the events of incident in his statement of June 14, 2010.

> The accident was happen... June 14, 2010, 13:30, that was 2nd Engineer call the electrician to check the steering motor breaker, because its all breakdown. And that was all engineman down to engine room. When I was getting inside the tunnel, I saw the water almost 3 meters high. So I was trying to close the water type door where the waters came from. But I cant, because it's a lot of pressure...from steering room. When water continue getting inside the tunnel and engine room, in a few minutes tunnel is full of water. And chief engineer call all engineman, and they say we have nothing to do, we can't suspend the water getting inside. And that time Captain was sending abandon ship signal, around 13:40 to 13:50, and all crew transfer to netboat and skiff boat, except Captain and Chief Engineer.[112]

---

[110]Section II.B. ¶ 69-DE 157-3. Exhibit C-Keum Affidavit of June 14, 2010, p. 35 of 59.

[111]Section II.B. ¶ 43-DE 157-3. Exhibit C-Avenido Statement of June 14, 2010, p. 8 of 59.

[112]Section II.B. ¶ 71-DE 157-3. Exhibit C-Navarro statement of June 14, 2010, p. 37 of 59.

In his statement of June 14, 2010, Fishing Master Seok Jeon Yong, reported.

> We ....finished hauling the net at 10:00 a.m. Then we started sailing. Around 13:30 p.m....Rudder alarm started ringing and rudder stopped moving. So I checked the monitor which shows the rudder room through the CCTV, I saw plenty of water getting into vessel. After a while, chief engineer announced t[h]rough the speaker that we have to abandon the vessel. I checked one more time and found water was significantly got into vessel so I decided to put skiff down on the water by using hydraulic gear. And I called closest fishing vessel for rescue. After a while, at 13:40am I reported the situation to captain and he ordered abandon ship. All crews abandon ship but captain was on board...[113]

Boatswain Cheol Su Kim was resting in his sleeping quarters after lunch when he "heard the broadcasted voice of the chief fisherman ordering that the skiff be lowered." He went to the console and lowered the skiff boat and net boat after hearing the abandon ship order being broadcast. "I put on a life jacket and abandoned ship onto the skiff. Within 10 - 20 minutes after abandoning ship, the ship started tilting toward the port side and sank in an instant."[114]

Cong Van Nguyen, a deck man, observed that the ship was operating normal on June 14. He had finished his lunch and was taking a nap when the alarm sounded. "When we got up the ship was not tipped to the side yet". Afterwards, the crew members transferred to the small boat "to pull the net up and about 20 minutes later the ship started to tip to the side and sank at about 1:40 - 1:50...[115]

Kyehoon Cho, the cook, was on his way to the sleeping quarters with the assistant cook when "I heard the abandon ship alarm and the Chief Fisherman's orders to abandon ship." He gathered simple personal belongings, water, and bread and then "abandoned ship at 13:40 to board the SIFF. The ship seems to have sunk about 10 to 20 minutes later."[116]

Syafril, a deck hand, recounted the events as follows:

> On June 14, 2010, at 13:40 I heard the ALARM and the order from outside my cabin that the vessel was in danger. I immediately went out of the cabin and asked my friend what was happening and what I know is that the vessel was taking on water in the STEERING GEAR ROOM and the problem could

---

[113]Section II.B. ¶ 59-DE 157-3. Exhibit C-Yong statement of June 14, 2010, p. 25 of 59.

[114]Section II.B. ¶ 66-DE 157-3. Exhibit C-Kim affidavit of June 14, 2010, p. 32 of 59.

[115]Section II.B. ¶ 73-DE 157-3. Exhibit C, Nguyen statement of June 14, 2010, p.39 of 59.

[116]Section II.B. ¶ 51-DE 157-3. Exhibit C, Cho affidavit of June 14, 2010, p.16 of 59.

not be overcome.  At 13:45 the alarm or signal sounded to ABANDON SHIP and on the Captain's orders, the crew immediately evacuated the vessel or were in the SKIFF until the vessel sank.[117]

Dahee Man, the First Oiler, was cleaning the handling room at about 13:30 when he heard the frantic voice of the Chief Engineer.  From the handling room manhole, he saw the Chief Engineer heading to the engine room from the steering room.  Later, he heard the abandon ship alarm and the abandon ship order and boarded the Skiff.[118]

Ha Dinh Dang, a deck man, recalled that the vessel was casting fishing nets normally in the morning.  After finishing their rounds, "we took a nap when we heard the alarm sounded and noticed that the ship seems to be tipped to the side.  We transferred to the small boat to pull the net up and 20 minutes later the ship sank to the bottom at (1:40-1:50).[119]

War Jani, an oiler, heard the alarm "sounded 3 times.  Within the next few minutes the bridge announced that the Steering Gear Room was flooding.  All the Engine Crew went below [to the] ENGINE ROOM.  After the Chief Engineer checked, it was apparent that the water could not be staunced (the steering gear was damaged)."  The Chief Engineer then told the Fishing Master that the vessel was not steerable "but it might be possible to salvage many of the engines."  Then, the Fishing Master and the Captain decided to have the ship abandoned.[120]

Bong Soo Kim, the First Officer, was resting in his sleeping quarters when he heard the alarm ring.  He went to the wheelhouse to find that the engine was not in operation.  When he asked the Second Officer why the engines were not in operation, he was told that "it was stopped because the wheel had stopped."  He could see through the CCTV in the wheelhouse that large amounts of water had infiltrated the steering room.  An order to abandon ship was given and the "NET Boat and SKIPBOAT" were lowered, He boarded the "skip" after he saw that the other crew members had boarded.  "I was too preoccupied to see the exact time but I

---

[117]Section II.B. ¶ 80-DE 157-3.  Exhibit C, Syafril affidavit of June 14, 2010, p. 46 of 59.
[118]Section II.B. ¶ 55-DE 157-3.  Exhibit C, Han affidavit of June 14, 2010, p. 21 of 59.
[119]Section II.B. ¶ 52-DE 157-3.  Exhibit C, Dang affidavit of June 14, 2010, p. 18 of 59.
[120]Section II.B. ¶ 57-DE 157-3.  Exhibit C, War Jani affidavit of June 14, 2010, p. 23 of 59.

believe I abandoned ship at about 13:40 - 13:50.  I think the ship sank about 20 minutes later."[121]

Herman Wattimena, the Third Engineer, was sleeping at 13:40 and "only heard the order when the alarm sounded" at the steering gear room.  He could see "flooding in the TUNNEL and on order of the CHIEF ENGINEER that the water could not be staunched and the order was given to leave the vessel because of the signal ABANDON SHIP.  At 13:45 the Captain ordered us to abandon ship and then the vessel sank."[122]

Ellis Taleu, Jr., the observer, was at the winch control area in the upper deck watching the SETS or doing the Brailings.  He went to the upper deck around 12:40.

> Anyways, while sitting there for a while, I, then heard an urgent/excited announcement on the speaker.  A minute later four crew members came running out toward the Skiffboat, and kneed at the portside of it, where the chains are piled at and looked /studied whatever underneath the Skiffboat, then turned around and ran to their rooms(cabin), I, then knew something was wrong.  Oh, before the orders for the four crew to check the underneath the Skiffboat, as I sat on the Fishmaster's high chair, I noticed that the end of the Skiffboat and the FV itself was riding very low, from the level of the sea and dip under every now and then, I thought to myself, is it because of the cargo we got last night from the cargo ship and the catch we caught this morning.  (Cargo-machine parts, food, plywood boards, steel rods, bolts and nuts,...lots of stuff).  So, after seeing the four crew run back to....the cabin, I knew that something was wrong so I ran back to the wheelhouse, took my last grid position....By this time, the Fishmaster already announced "abandon Ship", I went to my room, the Boson was there, the crew were assembling in the hallway w/their luggages, so, I went into my room grab my backpack with my workbook inside and left to go to the Skiff Boat, when I got there most of the crew were there at the lower deck starboard side, and the Skiff Boat was there so we jumped into it, but due to the rough seas, I fell on my left side and hurt my right leg....[123]

After the incident, a "Crew Missing Accident Report" was jointly issued by Chief Officer Bong Soo Kim and Fishing Master Seok Jeon Yong.  The Report noted the date and time of sinking as: "About 1410 hours 14th June 2010."  Paragraph 5 of the report provided a summary of the events.

---

[121]Section II.B. ¶ 63-DE 157-3.  Exhibit C, Kim affidavit of June 14, 2010, p. 29 of 59.

[122]Section II.B. ¶ 87-DE 157-3.  Exhibit C, Wattimena affidavit of June 14, 2010, p. 58 of 59.

[123]Section II.B. ¶ 83-DE 157-3.  Exhibit C, Taleu written statement of June 14, 2010, pp. 51-53 of 59.

The vessel casted Payao at 0520 hours ...on 14th June 2010 and hauled at 1000 hours same day.  Then, the vessel sailed  but at around 1330 hours...the steering machine was stopped with steering trouble alarm, which was confirmed through the CCTV in the steering gear room that there was a leakage of water in the steering gear room.  Chief Engineer together with engine room watchmen attempted to confirm the water ingress situation and take measures to stop it but failed due to too much water was coming in.  The C/E made an announcement that the ship should be abandoned and the Fishing Master, in discussion with the American Captain, instructed the crew members to lower the skiff and the net boat and then called through the phone an American vessel "Pacific Breeze" and a Korean vessel "Cosmos Kim" and requested for rescue.

At about 1340 hours local time, having received further report from C/E on the situation, the American Captain gave an order for the ship-abandonment.  All the crews mustered at the abandonment position and then finished boarding onto either the skiff or net boat around 1350 hours....However, seeing that the Captain still remained on the vessel, Fishing Master and 2/O urged him to abandon the vessel quickly but he ordered them to abandon first.  A bout 1353 hours, C/E (Chang Cheol Yang) who had already boarded on the skiff re-boarded to the vessel to join with Captain.  At around 1407 hours they went down to the site to re-confirm the situation but within not more than 2-3 minutes, the vessel listed to portside and sank with capsizing, before the American Captain and C/E came out from the vessel.  Thereby two crews missing accident occurred.[124]

All of the crew members of Majestic Blue made statements regarding the events surrounding the sinking of the Majestic Blue.  Of the crew members, two were subsequently deposed for purposes of the actions herein, namely Herman Wattimena, the Third Engineer, and Bong Soo Kim, the Chief Officer.

Herman Wattimena was deposed on October 11, 2012, approximately two years and four months from the events of the sinking of the Majestic Blue.  In his deposition, Wattimena indicated that he got on board the vessel in China while the vessel was undergoing dry dock.  It was his first time working on the Majestic Blue and worked on board for about ten days before the vessel left for Guam.  While in China, his work included assisting in aligning the ship's pipes, maintenance of the generator, and assisting in receiving engine parts.  He did not perform any work in the steering gear room with the rudder, rudder post, or packing gland.  He took orders from the Chief Engineer.  During the voyage to Guam, there was no job assignment for

---

[124]Section II.B. ¶ 40-DE 157-3.  Exhibit C, Crew Missing Accident Report, pp. 2-3 of 59.

1  the area of the rudder or the packing gland.  Furthermore, he did not see any leaks on the

2  packing gland when he made his inspections.  He also stated that no one told him there was any

3  problem with the rudder, rudder post, or packing gland.[125]

4      During his layover in Guam, he stayed in the vessel and did his normal two times per

5  day watch.  Likewise, no one told him there was any problem with the rudder, rudder post, or

6  gland.  He was part of the abandon ship drill and the fire drill.  They did both drills about three

7  times.  He saw Unterberg working in the ship but was not involved in his work.[126]

8      After the vessel sailed from Guam, Wattimena continued to have two watches per day in

9  the engine room.  He continued to inspect the rudder, the rudder post, and the packing gland and

10  did not observe any problems.  "I saw everything, all, in order."[127]

11      On the morning of the day the ship sank, Wattimena went to the steering gear room and

12  inspected the rudder, rudder post, and packing gland between 7:00 to 8:00 a.m.  He didn't see

13  any problem.  It was customary to have daily meetings around 7:00 a.m. to make work

14  assignments.  During these meetings, he was never assigned to do work in the steering gear

15  room to do repair on the rudder, rudder post, or rudder packing gland.[128]

16      Wattimena said he saw the Captain once in the engine room as he was making his

17  rounds but did not talk to him.  He said there was a "water tight door between the steering gear

18  room and the tunnel" and the tunnel leads to the entrance of the engine room.[129]  He also said

19  that the distance between the door of the steering gear room to the entrance of the engine room

20  was "(a)bout 15 to 20 metre."[130]

21      While sleeping in his room, Wattimena heard an alarm from the engine room and at the

22  same time, he heard an announcement from the bridge that water was coming into the steering

[125]Section II.B. ¶ 89-DE 158-1.  Wattimena deposition, p. 14.

[126]*Ibid.*  Pp. 17-18.

[127]*Ibid.*  P. 19.

[128]*Ibid.*  pp. 20-21.

[129]*Ibid.*  p.22

[130]*Ibid.*  p. 23.

gear room. He voluntarily went to the engine room and saw the Second Engineer there. He then proceeded to the tunnel and tried to enter the steering gear room but was stopped by the Chief Engineer. He "saw water coming out from the steering gear room, but I did not see—physically see water—state of water in the steering gear room." Water was coming out of the steering gear room into the tunnel. He tried to close the water tight door but could not do so. The Chief Engineer tried to help him close the door but they could not do so because of the pressure of the water that was coming out of the steering gear room into the tunnel. When they couldn't close the door, he was instructed by the Chief Engineer to go on deck to operate the hydro engine to lower the skiff boat into the water.[131]

Wattimena heard two announcements made over the loud speaker. The first announcement was made by the second engineer "that water has entered the steering gear." The second loud speaker announcement he heard came from the Chief Engineer "that there was too much water in the engine room."[132] The announcements were made in Korean.[133]

When asked how many water tight doors were there that lead to the tunnel, Wattimena responded that from the steering gear room to the shaft tunnel there was only one water tight door.

> Q. Were there other water tight doors that lead into the shaft tunnel?
> A. From the steering gear there is only one.
>
> Q. Is there another water tight door in the shaft tunnel other than the door to the steering gear room?
> A. There is only one water tight door from the steering gear to the shaft. There is no other in—in—in the engine room except there is one on—on the—as a skylight on deck.
>
> Q. Is there a water tight door between the engine room and the shaft tunnel?
> A. No doors. (Pause) There is only a seal. There is only a seal. There is no actual door there.
>
> INTERPRETER: There is a frame. Door frame but there is no door between engine room and shaft tunnel.[134]

---

[131]*Ibid.* pp. 23-27.

[132]*Ibid.* p. 46

[133]*Ibid.* Pp. 45-48

[134]*Ibid.* p. 48-49.

Wattimena further stated that had there been no water coming into the tunnel from the steering gear room, he would have been able to close the water tight door.

> Q. When the vessel was on its way from China to Guam was the water tight door to the steering gear room kept shut?
> A. It remained open.
>
> Q. Did anyone ever tell you to keep the water tight door shut when you were in the steering gear room?
> A. No.[135]

Wattimena further stated that one could only enter the steering gear room through the tunnel. However, you could get to the engine room from the tunnel or through a water tight door on the wet deck that lead to the engine room.[136]

Wattimena also stated that from the time he heard the alarm in his room to the time the ship sank was "about half hour—30 minutes."[137]

Wattimena was also questioned regarding the location of the unit 2 alarm lamp that Second Engineer Keum referenced in his statement. He stated that the control panel was located on the wet deck. When asked whether there was any panel in the engine room, he replied that there was none.[138] Once an alarm lamp lit, he said it would remain lit until it is reset. When asked if he ever had to reset an alarm in the control panel, Wattimena said that he did. He was also asked when he would reset an alarm. He replied: "(n)ormally when starting the engine or at time of shutting down the engine there will surely be alarm."[139]

When Wattimena first entered the tunnel, he said that the level of the water was "about one metre from the bottom—from the base." The second engineer was the only person there. The Chief Engineer came afterwards and then three other crew men came after him. The other crew men were War Dani, Rolly Viejo, and Dahee Man. When he came to the tunnel, he did not see the second engineer trying to close the water tight door. He said he was the first one

---

[135]Ibid. p. 49

[136]*Ibid*. p. 52

[137]*Ibid.* p.57

[138]*Ibid.* p. 89

[139]*Ibid.* pp.90-91.

who attempted to close the door.[140]

Wattimena was also asked whether he received any training for flooding below the Vessel's water line level.

> Q. Did anyone ever train you that you were supposed to close the water tight door below the water level if the vessel was flooding below the water level?
> A. At the time I was on Majestic Blue there was no such standing order. But when I attended on board the new ship, Pacific Breeze, it is an outstanding instruction to close the water tight door when there is nobody in the area.
>
> Q. Okay, but my question is a little bit different than that. My question is: Before the sinking of the Majestic Blue, did you ever receive training telling you that if the vessel started flooding, you need to close the water tight door below the waterline immediately?
> A. I have not come across such instructions.[141]

Bong Soo Kim was the other crew member deposed. He was deposed on June 27, 2013, a little over three years from the date of the sinking of the Majestic Blue. He stated his occupation was that of a seaman and became one after high school. His first license was that as a fifth officer and he was learning the job on site. He became a member of the crew at China while the vessel was undergoing dry dock there. He said he was unaware of any problems with the packing gland while it was in port on Guam or during the trip after it left Guam. As First Officer of the Majestic Blue, if it had a problem with the rudder packing gland, it would have been brought to his attention. During the trip, he never reported to the Captain that there was a problem with the packing gland and no one else did. He, along with the crew, obeyed the Captain's orders and his authority was also respected by the crew.[142]

Kim was asked regarding the competency of the crew.

> Q. In the 25 days that you sailed as chief officer on the MAB, were you able to evaluate the competency of the ship's crew members?
> A. Yes. And the crew members all boarded the MAB with the adequate qualifications for their jobs.
>
> Q. And just as of, just speaking generally, ...was it your evaluation of the crew that they were competent?

---

[140]*Ibid.* pp. 93-95.

[141]*Ibid.* pp. 105-106.

[142]Section II.B. ¶ 92-DE 161. Kim deposition, pp. 6-7, 11-12, 14-18.

A. Yes, (t)hey were adequately competent and had the qualifications.[143]

Recalling the day the vessel sank, Kim said it sank at "approximately 1400 hours on June 14th, 2010."[144] He was resting in his cabin and heard the "general alarm sounding from the engine room." He also felt the vessel stop. Within five seconds after hearing the alarm he was at the bridge since his cabin was only three to four meters away. At the bridge, the second officer who was on duty told him that "the steering gear was not functioning properly and thus, the main engine had been stopped."[145] Through the CCTV, he "observed a large quantity of water inflow in the steering gear room." He then ran to the captain's cabin which was only three meters away and told him that there was a lot of water in the steering gear room and that he had to come and see it right away. The Captain was asleep in his cabin.[146] The Captain then came to the bridge and observed the CCTV. When asked what happened after the Captain had observed the CCTV, Kim replied:

> I reported to Captain Hill, but I also reported to the fishing master. And the two of them came to the bridge and having checked the CCTV, consulted between themselves and said that this was a difficult situation.
> As for the chief engineer, he tried to go to the steering gear room himself but he reported to the bridge that – and also he made an announcement over the broadcasting system on the vessel that the water tight door would not close. And thus, Captain Hill talked to fishing master and then gave the abandon ship order to the seamen.[147]

Kim also stated that when the alarm went off, it was sudden and unexpected. Before the alarm went off, he was not aware of any indication of any type of problem on the vessel.[148] He further stated that the Captain and Fishing Master were communicating with each other in English and had no problems doing so. No one acted as a translator. When asked who ordered the abandon ship, Kim responded saying the decision was made after the Fishing Master and the

---

[143]*Ibid.* P. 23.

[144]*Ibid.* P. 18.

[145]*Ibid.* P. 19-20.

[146]*Ibid.* Pp. 20-21.

[147]*Ibid.* Pp. 21-22.

[148]*Ibid.* P. 23.

Captain discussed the situation, but he did not recall who gave him the abandon ship order.[149]

After the abandon ship order was made, the order was then given to prepare the skiff boat and to lower it into the water. The emergency bell rang signaling the abandon ship order. All the seamen converged on deck and proceeded to board the skiff. Kim explained that on "a purse seiner, the skiff is connected, the skiff connects the net to the purse seiner, so it's a vessel or boat that's used for work purposes." The skiff is able to generate it's own power. It is made of steel and is approximately ten meters in length and six meters in width with tonnage between 35 to 40 tons.[150]

When asked if there were other boats within the Majestic Blue, Kim said there was a net boat, a speed boat, and a life raft. He said the life raft was made of rubber. When asked why he was ordered to prepare the skiff boat rather than the life raft, he said he did not know.[151]

Kim was asked whether the water tight door to the steering gear room was working properly and he replied that it was. When asked why it had to be welded again in Guam by Pacific Welding, he answered: "The watertight door usually remains closed, and I am not too familiar with any work done on watertight doors." When further asked whether he was aware of the work done on the water tight door in Guam, he said that he was but that he did not directly confirm it himself.[152]

After the abandon ship order was given, Kim stated that the crew gathered on deck to get into the skiff boat except for Captain Hill.[153] The crew began boarding the skiff boat approximately seven minutes thereafter. He was the last one to board. After he boarded, Captain Hill came down and handed him his lap top and told him "to wait for a little" and then he walked back to the bridge. At that point, there was no major change in the stability of the vessel. It was just a little bit deeper more deeper into the water than usual. As they were

---

[149]*Ibid*. Pp. 24-25.
[150]*Ibid*. Pp. 25-26.
[151]*Ibid*. Pp. 26-27.
[152]*Ibid.* P. 55.
[153]I*bid*. P. 30

waiting for the Captain, the Chief Engineer, Fishing Master, and Second Officer went back to the vessel to look for the Captain approximately three minutes thereafter.[154]  When asked what happened next, he stated:

> After a certain amount of time had passed I saw four people come from the bridge toward the skiff.  But afterwards I don't recall exactly what happened.  I do remember seeing the fishing master and the second officer on board the skiff, but I don't recall seeing the chief engineer or Captain Hill.  And in little while, about two or three minutes, I remember that the main vessel sank.[155]

### III.  FACTORS THAT CAUSED THE VESSEL TO SINK

#### A.  The Condition of the Vessel.

The condition of the vessel was a factor in the sinking of the Majestic Blue.  The court has previously noted the condition of the Vessel in its discussion above and briefly discusses some of those conditions herein.  The Majestic Blue was a thirty-eight (38) year old vessel when it sank on June 14, 2010.  It was built in Spain in 1972 and was acquired by Dongwon in 1979.  It was the oldest vessel in Dongwon's fleet when it was acquired by Petitioner in 2008.  Prior to the China dry docking, it underwent dry dock repair in the Philippines in 2008.  Unterberg acknowledged that the vessel had not undergone "good DD" in the last few years.  One of Majestic Blue's early captains, John Jeskevicius, described the vessel as a piece of crap, that her seaworthiness was suspect, and that it was the worst one he had worked on in relation to seaworthiness.  In January, 2010, Captain Thomas Ridenour took over as captain of the ship.  He had great concerns regarding the condition of the vessel and questioned whether it was financially sound to repair the vessel because it had so much wasted steel.  He prophetically opined that dry docking the vessel with minimum repairs would surely cause it to sink.

The vessel went into drydock at a facility in China that stirred opposition from Ridenour and Unterberg.  Even the Fishing Master, the Chief Engineer, and Chief Officer were not happy going there and the Chief Mate described the facility there as dirty, disorganized and shoddy.

---

[154]*Ibid*.  Pp. 31-36.
[155]*Ibid*.  Pp. 37-38.

Despite opposition to a China dry docking, Dongwon decided to have the Majestic Blue dry dock there for her biannual repairs.

What was intended by Dongwon to be a regular 23-day dry dock turned out to be over forty days as predicted by Ridenour.[156]  More importantly, when the vessel left China, it did so because the space it occupied was needed for another ship that was coming in for dry dock repairs.  Thus, the Majestic Blue had to leave the Longshan facility even though all the repairs that needed to be done to the vessel were not fully completed.  Byeong H. Lee, Dongwon's representative at the drydock, stated that the drydock at Longshan took longer than expected because there were a lot of additional repairs that Ridenour and Unterberg requested to be performed on the vessel.  The additional repairs included a whole plate renewal as well as the renewal of plates inside a tank.  The plates needed to be renewed because the thickness was not thick enough.

Ridenour was so concerned about the Chinese welds that he sent an email to Unterberg the day the vessel left to Guam.  He stated:

> There are so many Chinese welds on the ship that I would not know where to start in checking them out....I can't say if it was from a Chinese weld or just old age. **I know of no specific plate welding that is leaking at this point.**  Mr. Lee had the Chinese redo several welds in the hull that they screwed up....What worries me is all of the little stuff that was done  wrong that we will never know about until it comes apart.  I could also show lots of things that should have been done that weren't....For example, the posts in the wet deck that are rusted through, broken and sistered were not replaced.  The Korean technicians patched them.  In the aft area of the wet deck there are frames and knees that are completely rotted through and some are actually 'floating' that is to say, not connected.  I found them late in the yard period and showed them to Mr. Lee but he was pressured and ran out of time.  If we get an inspector who really does his job there might be problems.  The ladder to the engine room is deformed with dangerously sloping steps.  Dongwon should pray that we get either very lazy or very stupid inspectors...[157]

As noted infra, Ridenour described the welding done in China as not very good.  He also stated that the amount of work done there was way beyond the abilities of that shipyard.

---

[156]Ridenour predicted a longer dry dock period because of the vessel's age and state of repair.

[157]DE 325-6, Exhibit 3, filed in CV 11-00034.

While afloat in Guam, some of the repairs that Unterberg and Ridenour wanted to have done on the vessel was performed. Welders from Pacific Welding, who were ABS approved welders, completed the additional work which was basically metal work, mostly welding.

While in Guam, it was also discovered that the rudder shaft packing gland was leaking excessively. Unterberg stated that when he inspected the rudder packing gland, he found that it was leaking "a little too high." In the Coast Guard report, it was noted that the packing gland was leaking excessively and a worklist item to correct was issued. The Coast Guard returned for a follow up examination two days later and still found the packing gland leaking. On the third day of examination, the Coast Guard reported that the rudder packing gland was still leaking. After calling for a second opinion, it was agreed that the rudder packing gland was to be monitored. Thus, when it left Guam, the vessel left with a rudder shaft packing gland that was still leaking and it was to be monitored.

Petitioner maintains that the vessel was seaworthy, primarily upon the statements by Ridenour. Ridenour stated that the vessel was seaworthy when it sailed from China to Guam and that it was even more seaworthy when it left Guam on its last voyage. Ridenour based his statements upon a review of all the repairs that the vessel had undergone in its dry dock at the Longshan Shipyard as well as the repairs that was done in Guam. In Guam, the vessel was subjected to cursory review by the Coast guard and received a Certificate of Inspection. Part of the repairs that needed to be undertaken in Guam came from the Coast Guard's work list of deficiencies that were noted on the vessel. While stating that the vessel became more seaworthy because of the additional repairs made in Guam, Ridenour also stated that the term seaworthy was a relative term and was quick to note that when the Majestic Blue sank, it was not seaworthy.

In assessing the condition of the vessel, the court notes that Dongwon attempted to repair the vessel as much as it could. It had a budget typical for a bi-annual drydocking of a purse seiner. The Majestic Blue, however, was not typical of the purse seiners. It was a very old ship and had poor dry dock repairs in previous years. Notwithstanding this, Dongwon made many repairs and spent a substantial sum of money at the drydock in Longshan. It could not complete

all the additional repairs that Unterberg and its then Captain, Ridenour, wanted because it ran out of time in China.  There was another vessel coming for dry dock repair and Majestic Blue had to leave drydock in China.

When the vessel came to Guam, the additional repair work that was alleged to be needed for repair was performed.  The vessel went through cursory Coast Guard inspection.  Even with the cursory review, the Coast Guard noted several deficiencies and observed that the vessel's rudder packing gland was leaking excessively.

In sum, despite the repairs that were made to the Majestic Blue during its dry docking at China and in Guam, it remained a very old ship.  It was 38 years old ship when it went into drydock in China.  The Vessel was in bad condition and its seaworthiness was suspect.  A former Captain said it was a piece of crap.  Ridenour questioned its seaworthiness and questioned whether it should undergo a dry dock repair in light of its age.

The Vessel went to dry dock at a facility that was not the choice for such dry docking by Unterberg and Ridenour, as well as the main officers on board her ship.  Its ultimate dry dock time almost doubled its original dry dock estimate.  Yet, the repairs were not complete.

Numerous welds that were done there by the shipyard's welders had to be redone when the Vessel came to Guam because the shipyard welders did not meet ABS standards for ship welding.  Ridenour, himself, questioned the quality of the welding.  "What worries me is all of the little stuff that was done wrong that we will never know about until it comes apart."

When the vessel came to Guam, the Coast Guard found that the rudder packing gland was leaking excessively.  The excessive leak from the rudder packing gland was not satisfactorily resolved and there was an agreement coupled by Unterberg's directive to monitor the packing gland daily and to report if the leak got worse.

Based upon the foregoing, the court finds that the condition of the vessel was a factor in the sinking of the Majestic Blue.

**B.    The Crew.**

The Majestic left Guam with a crew of 23 persons and an observer.  The individuals on board never before sailed together as a crew.  They were new to each other and many were new

to the ship. While being new to each other and new to the ship, the officers of the vessel were also inexperienced in their occupied positions.

For Captain Hill, this was only his second time on board the vessel. There was concern raised regarding Hill's competency to captain the vessel. Ridenour expressed to Unterberg his opinion that Hill was incompetent to lead the Majestic Blue. Unterberg had similar concerns and raised it with Dongwon. Dongwon, however, was concerned that Petitioner would be subjected to a suit if it breached the employment contract with Hill.

For Fishing Master Seok Jeon Yong, this was the first time he ever sailed on boat a ship like the Majestic Blue as its Fishing Master. For Bong Soo Kim, this was also the first time he ever sailed as Chief Officer. For Sungil Shin, this was also his first experience on board ship as a Second Officer. It was likewise for 19-year-old Minkeum Cha, his first experience as a Third Officer.

For the engineers, this was Yang's first stint on board ship as its Chief Engineer. Similarly, this was Moosub Keum's first experience on board Majestic Blue as its Second Engineer. It is important to note here also that Keum was described by Ridenour as an alcoholic and that he could not stay "off the sauce". Moreover, Ridenour stated that if he needed anything he either went to Chief Engineer Yang or Third Engineer Wattimena because Keum was always "you know".

When the crew came on board in China, Ridenour advised Unterberg that the crew appeared to have had no training nor was the crew ever subjected to any type of inspection. Thus, on the journey from China to Guam, Ridenour conducted fire drill and abandon ship training for the crew. Despite the training provided by Ridenour, the crew failed the fire drill test that was conducted under the auspices of the Coast Guard. The abandon drill test was postponed because of the fire drill failure. After repeated attempts, the crew did pass the fire drill and abandon ship drill.

The crew was not trained in safety procedures. They were not trained or directed to keep the water tight doors below sea level closed at all times except when being used. Being used meaning working within the immediate vicinity of the area. This is evidenced by Wattimena's

statement that the water tight doors were open during the voyage from China to Guam and when the vessel left Guam on May 21, 2010.

The crew also exhibited lack of training in emergency situations. When Wattimena was asked whether he ever received training to close the water tight doors during emergencies, as when flooding occurs below the ship's water line level, he replied that he never received any type of instruction in that regard.

On board ship, there were communication problems. The Captain was an American who only spoke English and only about a third of the crew spoke English. Almost all communications to the crew were in Korean. There was no common language on board ship. It is difficult to perceive how the Captain could communicate with the crew, other than those who spoke English, if most of the crew members spoke other languages. How is the captain to know that his commands are being properly disseminated and obeyed? At the time of the sinking of the Majestic Blue, important announcements regarding the condition of the ship and its preparation for evacuation and abandonment were made in Korean. Finally, and most importantly, the Radio Officer, the person in charge with communications for the ship, spoke no English.

The crew did not follow the Captain's orders and did not respect his authority. Days before the Majestic Blue sailed to Guam, Unterberg wrote an email to the crew advising them regarding their responsibility to obey orders from the Captain. It also directed the crew to report all emergencies immediately to the Captain so he would be able to respond appropriately. It advised the crew that the Fishing Master was not the head of the vessel but had authority when it came time for fishing. The letter was probably precipitated by Ridenour's experiences with the prior crew. He said that on several occasions, the crew would violate all his standing orders. One of his biggest problems was issuing orders that no one followed. "And my standing orders were routinely violated."

As the prior captains of Majestic Blue had documented, the Fishing Master was treated by the crew as the authoritative person on board the vessel, not her captain. The captain was a titular head. He had to be there because American law required the master of a U.S. flagged

ship to have an American master at a minimum.  This was also indicative of the incident herein.

During the immediate events surrounding the sinking of the Majestic Blue, the Captain's absence was quite apparent.  The Second Engineer, who initially saw the unit 2 lamp lit after hearing the alarm, never sought to immediately inform the Captain of the pending situation.

The evidence does not show that the  Chief Engineer ever sought to advise the Captain of the nature of the alarm emergency.  It appears that he may have ordered the skiff to be prepared for an evacuation of the ship without consultation with the Captain.

The Chief Officer, in his deposition, stated that once he was advised that water was coming in from the steering gear room, he went right away to advise the Captain.  Later on in his deposition, however, he stated that prior to going to the Captain to advise him of the water ingress problem, he had first advised the Fishing Master.

In his statement, the Fishing Master stated that he heard the Chief Engineer announce by loudspeaker that they had to abandon ship.  He looked through the CCTV and noticed more water was coming in to the vessel through the steering gear room.  He then decided to put the skiff boat down and then he called the nearest vessel for rescue.  After a while at around 13:40, he reported the situation to the Captain and he issued the abandon ship order.  In this instance, the court sees a perfect example of the difficulties the prior captains of the Majestic Blue had encountered, a captain in name, with no real authority, and lack of communications with the crew.

Thus, in the immediate events surrounding the vessel's sinking, all important decisions regarding the safety of the ship and the need for evacuation were made by the Korean officers as opposed to the captain, who may have been the last person advised in the matter.

The First Officer stated in his deposition that the Majestic Blue crew was competent and they were all credentialed.  The court notes, however, that being credentialed does not equate to competency.  It is a component of competency that is measured against all the other components that determine competency.  As the court has stated above, the officers were inexperienced.  The Majestic Blue was used as a training vessel along with her sister ship, the Pacific Breeze.  A training vessel hardly has experienced personnel.

The court also finds that the crew lacked proper training on the fundamentals of ship safety, security, and emergency procedures.

A fundamental safety and security issue concerns the water tight door next to the steering gear room. Third Engineer Wattimena stated that the water tight door was generally open and not closed. He said it was generally open when the ship sailed from China to Guam and after the ship left Guam on its final voyage. When asked whether he had ever received training to close the water tight door when it was not in use, he said that he was not familiar with such an instruction. He further said that there was no standing order that the water tight door be closed on the Majestic Blue but there was one such order with regard to the Pacific Breeze, Majestic Blue's sister ship.

The crew did not receive training with respect to emergency matters. The Second Engineer who first came upon the steering gear room looked into it and saw six rudder posts broken and water coming in through the rudder post. A trained crew person would have attempted to close the water tight door. The evidence does not show that any crew member attempted to activate the bilge pumps to pump water out of the vessel. No one attempted in any way to prevent the water from coming in through the vessel by attempting to plug the hole from outside the ship. Ridenour suggested that a diver could have been sent down to plug the hole with plastics.

For all of the above reasons, the court finds that the crew's inexperience, lack of training, lack of command respect for the captain, lack of training for safety, security, and emergency matters all were factors that contributed to the sinking of the Majestic Blue.

**C.  Failure to Close the Water Tight Door.**

The parties agree that the vessel would not have sunk had the water tight doors been closed at both ends of the shaft alley area. Petitioner contends that it was the Captain's negligence in this regard that lead to the ship sinking. While he may be able to delegate that responsibility to the chief engineer or others, the Captain remained ultimately responsible for making sure that the water tight doors were closed. Had the doors been closed, the vessel would not have sunk.

Petitioner contends that Captain Hill was negligent in allowing the crew to sail with the water tight doors open. He failed to ensure that the doors were closed. First Officer Kim stated that the steering gear water tight door was generally closed, but this statement was in response to a question as to why that door needed to be repaired in Guam if it was working properly. Herman Wattimena, however, was more precise when he said that the water tight doors were left open during the voyage from China to Guam and as the vessel left Guam on May 21, 2010. He further said there was no standing order to close the water tight doors as was the case on the sister ship, Pacific Breeze.

The steering gear room water tight door was left opened on the day of the sinking of Majestic Blue. The Second Engineer stated in his statement that he had been working in the area approximately ten minutes before the steering gear alarm came on. That he was working within the steering gear room before the alarm came on might be a sufficient reason why the door remain opened. A more important question arises, though, as to why the Second Engineer did not close the water tight door after he had left the steering gear room after having gone inside to see the water gushing out and the six rudder posts that he saw had broken off? The second engineer was clearly negligent. There is no evidence that shows he ever attempted to close the water tight door. In contrast, Wattimena states that he was the first one to attempt to close the steering gear water tight door and was helped in his attempt to close the door by the Chief Engineer. Joseph Navarro stated that he also attempted to close the water tight door by the steering gear room as he came down the tunnel shaft but that there was so much pressure from the water coming in from the steering gear room that he was unable to close it.

With regard to the water tight doors, a dispute exists between the parties as to whether or not there was a water tight door between the engine room and the shaft alley. Petitioner asks the court to find that there was one, while Claimants ask the court to find that there was none. This issue presents a more difficult question for the court to resolve.

Petitioner refers the court to the deposition testimony of Unterberg and Ridenour and the Coast Guard Report for support. The Coast Guard Activity Report provides:

Upon entering the shaft alley from the lower mach space to re-check the

1  steering space WTD, noted oily bilge water in shaft alley bridge and
2  smell of diesel fuel....There is a WT bhd w/WTD btw the mach space
   and shaft alley.[158]

3  According to Petitioner, "mach space" refers to engine room.  WTD means water tight

4  door and "WT bhd" refers to a water tight bulkhead.  Based upon the above report, Petitioner

5  concludes that there was a water tight door between the tunnel shaft alley and the engine room.

6  In their depositions, Unterberg and Ridenour both stated that there were two water tight

7  doors in the shaft alley tunnel, one at each end.  Unterberg, in his survey report, also indicated

8  that repairs were made to the steering gear water tight door and to the water tight door by the

9  engine room.  "The water tight door from the lower engine room to the shaft tunnel was found

10 to have been repaired as necessary and was chalk tested and found to seal proper."[159]

11 In his deposition, Herman Wattimena was asked whether there was a water tight door

12 between the engine room and the shaft alley and he replied that there was none.  He stated there

13 was "only a seal."[160]

14 At the hearing on the summary judgment motions herein, Petitioner stated to the court

15 that it believed there may not have been a water tight door between the shaft alley and the

16 engine room.  Since then, Petitioner has taken the position that there were two water tight doors

17 within the shaft alley vicinity, one by the steering gear room and the other by the entrance to the

18 engine room.

19 In reviewing all of the statements made by the crew members regarding the events of the

20 sinking of the vessel, the court finds it quite puzzling that the crew members only attempted to

21 close the water tight door by the steering gear room.  In their statements, Wattimena, the Chief

22 Engineer, Navarro, and perhaps others make reference to their attempts to close the water tight

23 door by the steering gear room.  No crew person has made reference to any attempt to close the

24 water tight door by the engine room.  The attempts to close the water tight door by the steering

25 gear room by the crew members and the lack of any reference to any attempt to close the water

---

26

27 [158]Section II.B. ¶ 38-DE 157-1.  Exhibit A, Coast Guard Report, p. 6.

   [159]Section II.A.¶ 49-DE 125-1.  Exhibit 1, Unterberg survey report, 5(e), p. 9.

28 [160]Section II.B. ¶ 89-DE 158-1.  Wattimena deposition, p. 48.

tight door by the engine room plus Wattimena's statement that there was no such water tight door by the entrance to the engine room, creates speculation that perhaps there was no water tight door by the engine room.

However, based upon the Coast Guard Report, the statements by Unterberg and Ridenour and Unterberg's survey report, the court finds that there was a water tight door between the entrance from the engine room to the shaft alley when the Majestic Blue set sail from Guam on May 21, 2010.

There being a water tight door by the entrance to the engine room at the time of the sinking of the ship, the court finds that the crew members were negligent in failing to close the door or attempting to close the water tight door there as they had done so in relation to their attempts to close the water tight door by the steering gear room.

Thus, the Second Engineer's failure to initially close the water tight door after he had made his inspection of the steering gear room and his subsequent failure to close the water tight door after having inspected the steering gear after hearing the alarm, was a contributing factor to the sinking of the ship.

John Timmel was asked in his deposition the appropriateness of Second Engineer Keum's action in summoning his superior to inform him regarding the flooding as opposed to closing the watertight doors. He responded:

> Q. Would you consider that to be an appropriate step being taken.
>
> A. I would say that's definitely a very appropriate step, but it was not a corrective step. The correct step would have been for that individual to have closed either the watertight door to the steering gear room, or if that was not possible then to close the watertight door from the tunnel into the machinery room or engine room.[161]

Likewise, the crew's failure to close the water tight door located between the entrance to the engine room and the shaft alley was also a contributing factor in the sinking of the ship.

**D. Water Ingress From the Steering Gear Room**

When asked what caused the Majestic Blue to sink, Unterberg responded:

---

[161]Section II.B. ¶ 96-DE 165. Deposition of John Timmel taken on August 15, 2013.

The actual cause is still an allegation to me, because like I say, like I say, the only real people who would know would be the chief engineer in this case and the captain. But it is alleged that water ingress through the rudder shaft and then flooded supposedly the steering gear and then the shaft tunnel, and then it filled up part of the wet deck most likely because the vessel capsized; that was observed by the survivors. And that's what is alleged have happened.[162]

Two theories have been presented by the parties as the reason for the water entering the steering gear room and eventually flooding the vessel causing it to sink. The Claimants suggest that the packing gland leak became more excessive which ultimately caused a catastrophic event which lead to the flooding.

Petitioner suggests that the cause of the water ingress came from a break off of the rudder shaft.

**E.   Claimants' Theory**

Claimants assert that the excessive leaking of the rudder packing gland caused the water flooding within the steering gear room which eventually lead to the vessel's sinking.

One of Claimants' expert, Chris Law, explained that he contributed to the report "primarily related to the calculation of figures dealing with possible flow rates and things of that nature..."[163]  In order to determine the flow rate (the amount of water that is coming through a space), one must know the length or diameter of the space itself.  In the initial report, it was assumed that the rudder stock diameter was 12 inches and the packing gland thickness was one inch.  The flow rate would give an indication of how much water could be entering the vessel given a particular water line.[164]  Law also discussed a scenario where the clearance was reduced to one-fifth or 5 ml. clearance.  He explained that the reduction was based upon his conversation with Mr. Dolan and after having been provided with a stability book.

We provided an estimate of the volume of water that we think would be required and the extent of flooding to cause the vessel to sink. But don't forget that in our – also in our rebuttal report, we address the situation where the flow rate in a conservative estimate is restricted by the neck bushing underneath the packing gland. And that's where we come back to

---

[162]Section II.B. ¶ 35-DE 154-1.  Exhibit 1, Part 1, Unterberg deposition, p. 25

[163]Section II.B. ¶ 94-DE 163-1.  Chris Law deposition, p. 46.

[164]*Ibid.*  P. 62.

our five mill clearance or 4.8 mill clearance all the way around....
Because as the vessel sinks, the pressure head increases, so you have
an iterative process of head increasing, water flow rate increasing.[165]

Based upon a one-fifth inch or 5 ml. clearance, water ingress into the vessel would be 56 metric tons of water per hour. Law also generally stated that it would take an ingress of 560 metric tons of water to sink the vessel, 20 metric tons in the steering gear room, 140 metric tons in the shaft tunnel, and 400 metric tons in the lower engine room.

Law estimated in his report that the vessel would sink in seven to eight hours, if there was a catastrophic failure of the rudder packing gland and there was a five millimeter aperture flow rate at the through hull.

When confronted with the question that it did not take seven or eight hours for the vessel to sink, Law replied: "we don't actually know how long the vessel took to sink."[166] He stated that there was already significant water in the vessel when people responded to the alarm. The vessel "could have had a slow leak initially that was undetected for a period of time." He also believed that 56 tons of metric water could have come in undetected.[167]

Earlier in his deposition, Law stated:

There is an estimation of how much water may be "trapped" in inverted commas in the tunnel area, if we have a water level of 1.5 meters deep. And I think I have estimated that at between 35 and 45 metric tons. And therefore, I have said if the gland is four inches – or ten inches below the waterline, and based upon that, 45 – 35 to 45 metric tons of water could have entered to that volume within 15 to 20 minutes. And that's based on that flow rate.[168]

### F.    Petitioner's Theory

Kenneth Christopher Shortall, one of Petitioner's expert, explained his theory.

My theory is, in actual fact, more along the lines of the pintle has–the nuts has...not been properly fitted in the shipyard and the pintle has therefore fallen out. Therefore, that allows the whole rudder and rudder stock to bend over a period of time, as the ship is at sea. Therefore, because the bending of the rudder stock and the pits at the top of the

---

[165]*Ibid.* P. 66.

[166]*Ibid.* Pp. 74-75.

[167]Ibid. Pp. 75-76.

[168]*Ibid.* Pp. 64-65.

rudderstock leading to stress rises, there's been fatigue –"metal fatigue", if you want to call it – there's been a fatigue across the rudderstock and then the rudderstock has fallen out, leaving a hole in the steering flat 300 mm plus diameter.[169]

According to Shortall, at some point in time, the rudder stock falls away and creates the inflow of water.

Stephen Tierney, another of Petitioner's experts, stated that based upon the analysis that they did and the assumptions that they made, "I think the vessel gets to the sinking position or capsizing position around 50 minutes...which is consistent with this sort of timeline, given the uncertainties of witnesses and their recollections in an emergency situation."[170] He stated that the water would have been cresting over the comb of the steering gear room within a minute or two after the 13:30 alarm sounded and that it would have started filling the engine room within four to five minutes thereafter.[171] The engine room would have been half full in 15 to 20 minutes.[172] Based upon the amount of water that was coming in through the open rudder post, Tierney stated "it would have been difficult to close the water-tight door."[173] However, he found it difficult a question to answer how many minutes would have passed before the pressure from the water coming through the steering gear room would have prevented the crewmen from closing the water tight door.[174]

Captain Ridenour was asked his opinion regarding the cause of the sinking of the ship.

Q. When you wrote this sentence about metal fatigue in the rudder shaft cannot be ruled out, what were you talking about?

A. I meant that if the boat took water on, if it sunk, it would be impossible without examining the boat, which is lying in 15,000 feet of water, exactly what the cause of the sinking was. You couldn't rule out, nor, you know – it's not the most likely cause, but it could not be ruled out, is what I'm saying. In my mind, it's not the most likely cause of the

---

[169] Section II.B.¶ 37, DE 155-1, Shortall deposition, Exhibit 1.

[170] Section II.B. ¶ 91-DE 160-1. Tierney deposition, p. 85.

[171] *Ibid.* P. 151

[172] *Ibid.* P. 97.

[173] *Ibid.* P. 167.

[174] *Ibid.* Pp. 150-151.

sinking of the vessel, but it cannot be ruled out without being in the boat.

Q. So, based on your earlier testimony concerning the rudder packing gland
that had some seepage coming into the vessel, and you believe that in
your mind that leak became excessive and it May have been the cause
or a contributing cause of the vessel sinking – is that correct?

A. That is probably the most likely, or most likely reason the vessel sunk.
Obviously, according to the testimony of Herman and the other people
aboard, there was water coming in there, and the most likely reason
was the rudder packing gland failed.[175]

In determining the cause of the water ingress into the steering gear room, the court finds

that a catastrophic failure of the packing gland was the cause of the water ingress into the vessel.

From the statement of the witnesses, the vessel sank within 30 minutes to 40 minutes of

the sounding of the steering gear alarm. Under Petitioner's theory, water would have started

gushing into the steering gear room when the alarm sounded at 13:30 because that would have

been the time the rudder post would have separated from the ship. Based upon their computer

assimilation, the ship would have sunk in 50 minutes. The court notes, however, that the

official report filed jointly by the Fishing Master and the First Officer states that the steering

gear alarm went off at 13:30 and the vessel sunk around 14:09 or 14:10, 39 or 40 minutes later.

Wattimena stated that the vessel sank within 30 minutes after the alarm sounded. If the vessel

sank within 30 minutes of the steering gear alarm sounding off, then it would be mathematically

impossible to allot 50 minutes for water to continue to flow throughout the vessel because the

vessel would have already sunk. The same thing would be true taking into consideration a 40

minute time frame from the sounding of the steering gear alarm to the sinking of the vessel. It is

Petitioner's contention that their theory is the more likely and logical theory as the cause of the

sinking of the ship because their 50 minute time frame for the sinking of the vessel is closer to

40 minutes than a seven or eight hour time frame theory espoused by the Claimants. Petitioner

also suggests that the crews' statement regarding the times involved for the sinking of the ship

should be considered as approximations of time taking into consideration the emergency

conditions the crew faced.

[175]Section II.B. ¶ 95-DE 164. Ridenour deposition, p. 418.

Petitioner's theory presupposes that there was no water in the Vessel up to the time that the alarm in the steering gear room sounded. The evidence, however, shows that there was water in the Vessel before then. Herman Wattimena stated that when he got to the tunnel, there was already water there. The water was one meter high from the bottom of the shaft tunnel.[176] Randelito Avenido stated that as he went down to the tunnel, the water level was already "very high."[177] Joseph Navarro stated that as he went down to the tunnel, the "water [was] almost 3 meters high."[178] Ellis Taleu stated that prior to seeing the four men check underneath the skiff boat, the end of the skiff boat and the vessel itself were riding very low and would dip every now and then in the water.[179]

Wattimena stated that he made his rounds on the steering gear room between 7:00 to 8:00 a.m. the morning the ship sank. The time which would have passed from 8:00 a.m. to 1:30 p.m. is five and a half hours. This amount of time would be short of the seven to eight hours Law was alluding to in his deposition. However, according to Law, if the packing gland were four to ten inches below water line, 35 to 45 metric tons of water could have come into the Vessel within 15 to 20 minutes thereof.

Petitioner contends that there was nothing wrong with the packing gland at the time that the Vessel left Guam on May 21 and that the excessive leak issue which gave concern to the Coast Guard was resolved. The court, however, finds that the Coast Guard's concern regarding the excessive leak of the packing gland was not resolved before the vessel left Guam. After its initial observation that the packing gland was leaking excessively, the Coast Guard returned two days later and observed that the packing gland was still leaking excessively. On the third day, another Coast Guard representative was called in for a second opinion and the representative performed a rudder test. Another representative was called in for a second opinion because the vessel's representatives had advised the Coast Guard that there was no problem with the gland

---

[176]Section II.B. ¶ 89-DE 158-1. Wattimena deposition, p. 93.
[177]Section II.B. ¶ 43-DE 157-3, Exhibit C, Avenido statement, p. 8 of 59.
[178]Section II.B. ¶ 71-DE 157-3, Exhibit C, Navarro statement, p. 37 of 59.
[179]Section II.B. ¶ 87-DE 157-3, Exhibit C, Taleu statement, p. 50 of 59

on the trip from China to Guam.   Based upon such representation, the vessel was then allowed

to sail with the agreement that the rudder packing gland be monitored daily by the Captain and

that he report to the Guam office if the leak got worse.

In a statement, Ellis Taleu, said:

> A representative of Dongwon...was also present at the Vessel for the
> discussions with the Coast Guard inspectors in the port of Guam.  Both
> Mr. Unterberg and the Korean individuals were involved in intense
> discussion with the...inspectors....The discussion was focused on safety
> concerns regarding the functioning of the Rudder on the F/V MAJESTIC
> BLUE.  It was clear to me that the...Coast Guard had concerns regarding
> the safety of the Vessel and specifically the rudder.  I personally heard
> both Captain Unterberg and the Dongwon representative say things
> which concerned me at the time as they tried to convince the...inspectors
> to let the ship leave the port and return to fishing.
>
> I recall the...Inspector saying, "Just keep an eye on that packing!"
> Captain Unterberg saying to the Coast Guard representative, "I have
> not lost a Vessel in thirty years."  This particular statement worried
> me because it seemed to be in response to the possibility of the ship
> sinking.  I also heard the Dongwon representative say, "It is the Korean
> way!" which was to me not reassuring but an admission that Korean
> ships sail with less of a regard for safety.  This statement seemed wrong
> to me because it effectively admitted that the vessel was not safe
> because of the rudder situation.
>
> I recalled these statements...onboard the ...PACIFIC BREEZE...when
> all of the crew members repeatedly spoke about water coming into
> the Vessel through the Rudder Stock.[180]

Based upon the Coast Guard Report and the statement by Ellis Taleu, the court finds that

the excessive leaking of the packing gland that the Coast Guard had observed when it inspected

the vessel was not resolved when the vessel left Guam on May 21, 2010.

Furthermore, based upon all of the above, the court finds that the excessive leaking of

the packing gland was the reason for the water ingress into the steering gear room and that its

catastrophic failure was a contributing factor in the sinking of the ship.

### IV.   THE LIMITATIONS ACT

The Shipowners Limitation of Liability Act allows the vessel owner to limit its liability

in the event of a casualty or a loss.  46 U.S.C.A. §30505(a) provides:

---

[180]Section II.A.¶ 8-DE 100-8, Exhibit H, Statement of Ellis Taleu, p. 203.

The liability of the owner of a vessel for any claim, debt, or liability described in subsection (b) shall not exceed the value of the vessel and pending freight.

Under 46 U.S.C.A. §30505(b), a shipowner is entitled to limitation from claimants for:

Those arising from any ... loss, damage, or injury by collision, or any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of the owner.

The interest of Petitioner's total value in Majestic Blue is alleged to be $33,500.00, representing the value of the Main Skiff and life jackets as the Majestic Blue sank with all its appurtenances and equipment in the Western Pacific and was not recovered. This is the amount that is subject to the Limitation Fund.

Congress' purpose in passing the Limitation Act in 1851 was "to encourage ship-building and to induce capitalists to invest money in this branch of industry....The Act also had the purpose of 'putting American shipping upon an equality with that of other maritime nations' that had their own limitation acts." *Lewis[181] v. Clark Marine, Inc.,* 531 U.S. 438, 121 S. Ct. 993 (2001). It is generally filed in anticipation of a suit under the Jones Act.[182] Under a Jones Act claim, a suit would be brought by a seaman "who suffers injury in the course of employment due to negligence of his employer, the vessel owner, or crew members....Unseaworthiness is a claim under general maritime law based on the vessel owner's duty to ensure that the vessel is reasonably fit to be at sea." *Ibid.*; at 441, citing *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 550, 80 S. Ct. 926, 4 L. Ed. 941 (1960).

A trial in a limitation proceeding involves a two step analysis. The court must first determine whether any liability exists. If liability is found, then the court must "ascertain whether the loss or damage was occasioned or incurred without the 'privity or knowledge' of the owner of the ship." *Northern Fishing & Trading Co., Inc. V. Grabowski,* 477 F. 2d 1267 (9th Cir. 1973). The claimant has the burden of proof to show that the loss was caused by an unseaworthy condition or negligence by the owner. If claimant succeeds in her burden, the

---

[181]Lewis had filed a state suit against Respondent for injuries suffered based upon claims of negligence, unseaworthiness, and maintenance and cure.

[182]46 U.S.C. App. Section 688.

owner must then "disprove its privity or knowledge with regard to every possible cause." *Washington State Dept. of Transportation v. Sea Coast Towing, Inc.*, 148 Fed. Appx. 612 (9th Cir. 2005).

It is well settled that a shipowner owes a non-delegable duty to furnish a seaworthy vessel and that this duty extends to all employees of the stevedoring companies. *Billeci v. U.S.*, 298 F. 2d 703 (9th Cir. 1962), *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 80 S. Ct. 926 4 L. Ed. 941 (1960).

To be seaworthy, a vessel must not only be strong, staunch, and fit in the hull for the voyage that it is to undertake, it must also be properly equipped. Thus, there is a duty upon the owner to provide a competent master[183] and a crew adequate in number and competent for their duty,[184] and equal in disposition and seamanship to the ordinary men in the calling.[185] That the crew must be competent for their duties does not mean being only competent for the ordinary duties of an uneventful voyage but also for any emergency that is likely to happen at sea. *Re Pacific Mail S.S. Co.*, 130 F. 76, (9th Cir. 1904), cert. den. 195 U.S. 632, 25 S. Ct. 790, 49 L. Ed. 353 (1904); *Texas Co. v. N.L.R.B.*, 120 F. 2d 186, 8 L.R.R.M. (BNA) 886, 1941 A.M.C. 835, (9th Cir. 1941).

### A.    Burden Upon Claimants

As stated above, Claimants have the initial burden of proving that the loss of the vessel was caused by its unseaworthiness, or by an act of unseaworthiness, or by negligence of the shipowner. At this phase of the limitation trial, the court is tasked to determine the cause or causes for the loss of the Vessel.

In determining the cause of the sinking of the Vessel, the court finds it must determine whether the Vessel was seaworthy at the time it sunk. The evidence is quite clear that the

---

[183]*The Rolph*, 299 F. 2d 52, 1924 AMC 942, (9th Cir. 1924), cert. den. 266 U.S. 614, 45 S. Ct. 96, 69 L. Ed. 468 (1924).

[184]*American President Lines, Ltd. V. Redfern,* 345 F. 2d 629, 1965 AMC 1723, (9th Cir. 1965).

[185]*Boudoin v. Lykes Bros. S.S. Co.*, 348 U.S. 336, 75 S. Ct. 382, 99 L. Ed. 354, 1955 AMC 488  (1955).

weather was fair at the time the vessel sunk.  The evidence also supports a conclusion that the vessel sank approximately or within forty (40) minutes from the time the initial alarm went off. The evidence also appears to show that water ingress from the rudder shaft in the steering gear room, eventually flooding the steering gear room, the alley shaft, and eventually the engine room, lead to the ship's sinking.

It is generally maintained as a rule of evidence "that if a vessel be lost in fair weather, without the presence of any external cause or occurrence adequate to the production of the loss, the legal presumption is that she was either unseaworthy or improperly navigated, conducted, or managed; and to discharge the respondents, this presumption must be met, answered, and overthrown, by clear and satisfactory proof."  *New Jersey Steam Nav. Co. V. Merchant's Bank of Boston*, 47 U.S. 344, 1848 WL 6458 (1848).  It is generally held that "if a claimant establishes that a vessel is unseaworthy, the trial court May presume that the unseaworthiness was the proximate cause of the sinking, otherwise unexplained, of a vessel in calm seas." *Watson v. Lambertson,* 349 F. 2d 660, (9th Cir. 1965), *Admiral Towing Co. v. Woolen*, 290 F. 2d 641, 1961 AMC 2333, (9th Cir. 1961).

The court finds that the Majestic Blue sank in fair weather.  Because it sank in fair weather, the court presumes that it sank because of its unseaworthiness.  The court also finds the vessel was not seaworthy for the reasons stated in its discussion on the condition of the ship as a cause of the sinking of the vessel, *supra*.

The court also finds the vessel not to be seaworthy because it did not have a competent crew.  The court comes to this conclusion based upon the findings below.

When the Majestic Blue set sail from Guam on May 21, 2010, it was composed of a crew that had never before sailed together.  It also was a crew that May have been new to the Majestic Blue.  There were twenty-four (24) persons on board, consisting of a crew of 23 persons and one observer.

As to Captain Hill, this was his second tour of duty as Captain on board Majestic Blue.

As to Fishing Master Seok Jeon Yong, this was his first time sailing as a Fishing Master.[186]  As to Chief/First Officer Bong Soo Kim, this was also his first time sailing as a Chief/First Officer. As to Second Officer Sungil Shin, this was the first time he sailed as a Second Officer on board a vessel.  As to Third Officer Minkeum Cha, this was also the first he sailed as a Third Officer.

As to the engineers on board Majestic Blue, this was also the first time Chief Engineer Chang Cheol Yang[187] served as a Chief Engineer.  Similarly, this was also Moosub Keum's first experience as a Second Engineer on board a tuna seine vessel.  The newness of the crew to their positions was not surprising since Majestic Blue was used as a training vessel by its owner.  As the vessel departed Guam on May 21, 2010, its officers and engineers lacked experience in their occupied positions.

The court notes that Majestic Blue's crew, except for the Captain, was generally recruited and staffed by individuals chosen by Dongwon pursuant to its manning agreement with Petitioner.  Ridenour, however, states that it was customary for the Fishing Master to hire friends for positions within the vessel that he was Fishing Master of.

In further assessing the competency of the crew, the court notes that there was a problem in communication within the vessel.  While it was a U.S. flagged vessel, Captain Hill was the only American on board.  The Captain only spoke English.  There were several crew members that spoke "decent" or "some" English.  The Fishing Master spoke decent English.  The First Officer spoke very good English.  The Second Engineer spoke not too good English.  The Third Engineer Wattimena spoke good English as well as some of the Filipino crew members on board, namely, Viejo, Navarro, Avenido, and observer Ellis Taleu from Palau.

Unterberg stated that most of the important people usually spoke English.  He also stated that Radio Officer Bak spoke fairly good English and War Jani, an Indonesian, spoke some English.  Third Engineer Wattimena, an Indonesian himself, stated that War Jani did not speak

---

[186]The Fishing Master had sailed as the number two guy for twenty years.  See Section II.B. ¶ 95, DE 164, Ridenour deposition, p. 443.

[187]It was Yang's "first shot at being chief engineer before he was first assistant engineer." See Section II.B. ¶ 95, DE 164, Ridenour deposition, p. 443

English but spoke Korean.  Ridenour states that the Radio Officer spoke no English.  This inability to speak English in a very vital position was of great concern to him.

The extent of the captain's authority on board ship was also a contributing factor to the crew's incompetency.  Shortly, before Majestic Blue set sail from China to Guam, Unterberg sent an email to the crew via the Dongwon and advised the crew that the captain was the head of the vessel and not the fishing master.  The email in part represented complaints made in the past by prior captains of the ship that they in fact were titular heads within the vessel.  Unterberg wanted to instill in the crew that the captain was in fact the captain of the ship.  Despite the email, the crew remained in allegiance to the fishing master.  This was quite evident during the sinking  of the ship when the officers on board were reporting to the fishing master who assessed the situation and gave orders to ready the skiff  boat for evacuation and abandonment of the ship and actually calling the nearby vessels for rescue.   This having been all done, the captain was then advised in the premise.   All this having been done despite Unterberg's letter to the crew admonishing them to advise the captain immediately when an emergency situation arises.

The crew lacked training in basic areas.  Ridenour observed they had no training.  He did as much as he could to train them and despite his efforts, the crew still failed the fire drill test in Guam conducted under the auspices of the U.S. Coast Guard.   Eventually, the crew did pass the fire drill test and abandon ship test.  The crew's lack of training was especially evident during the period of the sounding of the alarm in the steering gear room to the sinking of the ship.  The crew did not close the water tight door next to the steering gear room when the alarm first sounded.  The evidence also is clear that no one attempted to close the water tight door next to the engine room.   The crew's lack of training and experience showed when it took no measures to try to lessen the effect of the water ingress into the steering gear room.  The bilge pumps could have been activated.  A diver[188] could have gone below the rudder post area and attempt to

---

[188]This was a measure that Ridenour suggested could have been done to minimize the water ingress into the vessel.

control the water ingress by placing plastic in the hole. All of these measures would have been apparent to a trained and experienced crew.

Based upon the above and on its discussion of the crew as a cause for the sinking of the ship, *supra*, the court finds the crew to be incompetent.

**B.     Burden on Petitioner**

"A shipowner has an absolute duty 'to furnish a vessel and appurtenances reasonably fit for their intended use'." *Havens v. F/T POLAR MIST*, 996 F.2d 215, 217 (9th Cir. 1993) (internal citations omitted). Once a claimant has established negligence or unseaworthiness, the burden is on the party seeking limitation of liability to establish that it is entitled to limitation because it was free of privity or knowledge of the negligence or unseaworthiness at issue. *In re Northern Fishing & Trading Co., Inc.*, 477 F.2d 1267, 1271 (9th Cir. 1973). Under 46 USCA § 30505, the Petitioner May only limit its liability if it can show that the fault causing the loss of its vessel occurred without its privity or knowledge.

**C.     Legal Standards for Privity and Knowledge**

"Privity or knowledge is not tantamount to actual knowledge or direct causation. All that is needed to deny limitation is that the shipowner, by prior action or inaction set[s] into motion a chain of circumstances which May be a contributing cause even though not the immediate or proximate cause of a casualty . . . ." *In re Amoco Cadiz*, 954 F.2d 1279, 1303-1304 (7th Cir. 1992). In Amoco, the vessel owner was not entitled to limitation of liability because its employees knew about issues with the vessel's condition but refrained from having the vessel repaired in order to obtain additional profits out of the vessel's time charter. *Id*. The court held, "[n]eglect to take adequate precautions after a faulty condition has been revealed by a misadventure, or made known by a warning, has been held to amount to privity, if indeed it does not amount to knowledge." *Id*.

According to the Court in *In re Western Pioneer, Inc.*, "[p]rivity or knowledge exists where a vessel owner breaches a non-delegable duty." 2002 AMC 1743, 1746 (W.D. Wash. 2002). The Court continued, "(f)or example, the duty to provide a competent master and crew is non-delegable." *Id*. (citing *Admiral Towing*, 290 F.2d 646). "Accordingly, a vessel owner who

breaches this duty renders a vessel unseaworthy and May not limit its liability." *Id*. (internal

citations omitted). "A shipowner May not limit its liability under the Limitation Act if its ship

is unseaworthy due to equipment which was defective at the commencement of the voyage." *In*

*re the Matter of the Complaint of Leo, LLC*, 2012 AMC 471, 480 (W.D. Wash. 2011).

"Petitioners…are charged with knowledge of the existence of the condition." *Id*. (citing *Villers*

*Seafood Co. v. Vest*, 813 F.2d 339, 343 (11th Cir. 1987)).

Furthermore, where a vessel owner has actual or constructive knowledge of a condition

likely to produce or contribute to losses, that owner has the requisite knowledge to break

limitation of liability. *States S.S. Co. v. United States*, 259 F. 2nd 458, 468 (9th Cir. 1957). As

the Ninth Circuit explained in *States*, "Within the meaning of the section of the statute limiting

liability, knowledge means not only personal cognizance but also means the knowledge - of

which the owner or his superintendent is bound to avail himself - of contemplated loss or

condition likely to produce or contribute to loss...." Id. (emphasis added); see also *Waterman*

*S.S.Corp. v. Gay Cottons*, 414 F. 2d 724, 732, (9th Cir. 1969). An owner must avail itself of

whatever means of knowledge are reasonably necessary to prevent conditions likely to cause

losses and cannot close its eyes to what prudent inspections would disclose. In *Wash. DOT v.*

*Sea Coast Towing, Inc*., 148 Fed. Appx. 612, 613 (9th Cir. 2005), the Ninth Circuit further

explained:

> Once claimant establishes the particular cause of loss or damage, the vessel
> owner is entitled to limit its liability only if the vessel owner then successfully
> demonstrates it was either neither privity to, or had knowledge of, the
> condition of unseaworthiness or the act of negligence that caused the accident.
> Privity or knowledge May be actual or constructive; ...the owner must also
> demonstrate that it has availed itself of whatever means of knowledge are
> reasonably necessary to prevent conditions likely to cause losses.

### D. Privity and Knowledge of Employees are Attributable to Petitioner

Where a corporate entity owns the vessel that has been found to be negligently operated

or unseaworthy, the privity and knowledge of its managing employees is imputed to the

company, including the privity and knowledge of the company's shoreside personnel. *Great*

*Lakes Dredge & Dock Co. v. City of Chicago*, 3 F. 3rd 225, 1993 AMC 2409, 1993 AMC 2984

(7tth Cir. 1993), aff'd 513 U.S. 527, 115 S. Ct. 1043, 130 L. Ed. 1024, 1995 AMC 913 (1995),

*Coleman v. Jahncke Service, Inc*., 341 F. 2d 956, 958 (5th Cir. 1965). Thus, "the test is whether culpable participation or neglect of duty can be attributed to an officer, managing agent, supervisor, or other high-level employee of the corporation." *In re Alex C. Corp*., 2011 AMC 157, 178 (D.C. Mass. 2010) (citing *Carr v. PMS Fishing Corp*., 191 F.3d 1 (1st Cir. 1999).

In *In Re Amoco Cadiz*, 954 F. 2nd 1279, 1303-1304 (7th Cir. 1992), the pool of individuals whose privity and knowledge is attributable to a corporate shipowner was greatly expanded to include even low level employees:

> The recent judicial trend has been to enlarge the scope of activities within the "privity or knowledge" of the shipowner, including imputing to corporations knowledge or privity of lower-level employees; requiring shipowners to exercise an ever-increasing degree of supervision and inspection; imposing a heavy burden on shipowners to prove their lack of privity or knowledge; rendering the shipowner's duty to ensure the seaworthiness of the ship nondelegable; and narrowing the group of potential defendants eligible for exoneration under the Act.

Similarly, where a sufficiently high level employee delegates authority to a lower level employee, the privity and knowledge of the lower level employee are attributable to the corporate vessel owner. *In re Alex Corp*., 2011 AMC at 177-78 (shipowner had privity and knowledge where the corporate owner's Vice President of Operations granted a lower-level employee's request to leave the tug at issue attended only by one, unlicensed crew member who had no experience piloting tugs and this decision was the direct cause of the tug's unseaworthiness and a substantial contributing cause of the puncture in the hull of the damaged vessel); *see also In re Great Lakes Transit Corp*., 81 F.2d 441 (6th Cir. 1936) (concluding that a shipowner was not entitled to liability limitation since the person the shipowner had left in charge of the vessel knew of the vessel's defect and this knowledge was imputed to the shipowner). Additionally, "when a manager knows of an unseaworthy condition, his instruction to a subordinate to remedy the condition does not negate the manager's actual knowledge*." In The Matter of the Complaint of Leo*, 2012 AMC 471, (W.D. Wash. 2011)

Courts have also held that where companies had representatives of the corporation at a shipyard where work was being performed a substantial part of the time during which the repairs of which they were in charge were being made and those representatives were sufficiently high

in the managerial hierarchy of the defendant or petitioner, "their general and detailed knowledge and their close proximity to the repair project was imputed to the corporation." *Federazione Italiana Dei Corsorzi Agrari v. Mandask Compania de Vapores, S.A.*, 388 F.2d 434, fn. 6 (2d Cir. 1968) (citing *Coryell v. Phipps*, 317 U.S. 406 (1942)).  See also *In re the Complaint of Patton-Tully Transportation Co.*, 797 F.2d 206, 211-212 (5th Cir. 1986) (holding that company works manager was sufficiently high in the corporate hierarchy such that his knowledge was chargeable to the corporation) (citing *Spencer Kellogg & Sons, Inc. v. Hicks*, 285 U.S. 502 (1932)).

Importantly, an employee's scope of responsibility with regard to the vessel, not his job title, determines whether to charge the owner with privity and knowledge of the matters he was in charge of overseeing.  *Coleman v. Jahncke Serv., Inc.*, 341 F.2d 956, 958 (5th Cir. 1965).  A corporation is prevented from limiting its liability by the act of a managing agent when 'the negligence is that of an executive officer, manager or superintendent whose scope of authority included supervision of the phase of the business out of which the loss or injury occurred….'" *Continental Oil Co. v. Bonanza Corp.*, 706 F.2d 1365, 1376 (5th Cir. 1983) (citing Coryell).

In the present matter, Jürgen Unterberg was Petitioner's General Manager and its sole shoreside employee.  In that capacity, Unterberg falls within the category of employees  whose privity and knowledge is imputed to Petitioner.  In addition, Unterberg assigned Captain Ridenour to oversee the Vessel's 2010 drydock at the Shipyard in China on behalf of Petitioner.  Thus,  Ridenour's privity and knowledge of the events that took place surrounding the Vessel's drydocking are also attributable to Petitioner.  Finally, Unterberg's order to Captain Hill to monitor the vessel's leaking rudder stock once the vessel went to sea did not absolve Unterberg's duty to make the Vessel seaworthy or his knowledge that the Vessel was leaking through its  rudder  stock.  In  fact, it proves he let the Vessel sail in an unseaworthy condition.  Moreover, Unterberg agreed with the Coast Guard to have the packing gland monitored daily and have daily reports made.  Unterberg failed in this regard, having dispensed with said reporting unless the situation changed drastically.

/ / /

1          **E.      Dongwon's Privity and Knowledge is Imputed to Majestic Blue.**

2          "[W]here an owner expressly delegates full authority to act for and on his behalf to an

3    agent, he is bound by the acts of the agent and will be held in privity by the knowledge of the

4    agent.'" *Alex C. Corp*., 2012 AMC at 178 (internal citations omitted).  In *Alex C. Corp*, the

5    vessel owner, a single-asset vessel owning company, hired another company to operate, manage,

6    and maintain the vessel.  *Id*. at 178.  The Court found that the knowledge of the corporation that

7    operated, managed, and maintained the vessel was attributable to the shell corporation that

8    owned the vessel, such that neither were entitled to limit their liability.  *Id*.; *see also Leo, LLC*,

9    2012 AMC at 479 (holding that, given the management structure of a one-asset vessel-owning

10   holding company, one limitation petitioner's privity and knowledge was attributed to all other

11   petitioners).  As such, Majestic Blue cannot  avoid  liability by claiming it delegated  crew

12   manning and maintenance of the F/V MAJESTIC BLUE to Dongwon or to Unterberg.

13         **F.      Privity and Knowledge Constructively Imputed to Petitioner**

14         The law is clear – a ship owner's knowledge need not be actual; rather, the ship owner is

15   chargeable with knowledge of acts or events or conditions of unseaworthiness that could have

16   been  discovered through  reasonable diligence. *Empresa  Lineas  Maritimas  Argentinas  S.A*. *v*

17   *United States*, 1984 AMC 1698 (4th Cir. 1984). The Ninth Circuit has explained:

18                    Privity or knowledge May  be actual or constructive;  therefore, in
                      addition  to showing a lack of actual knowledge or the cause of the loss,
19                    the owner must also  demonstrate  that  it has  availed  itself  of whatever
                      means  of knowledge are reasonably necessary to prevent conditions
20                    likely to cause losses.

21   *Washington State Department of Transportation v. Sea Coast Towing Inc*., 148 Fed. Appx. 612

22   (9th Cir. 2005).

23         In the case of corporate owner, the question is not what the corporation's officers and

24   managers like Jürgen Unterberg actually knew, but what they objectively ought to have known.

25   *In  re Complaint of  Patton-Tully Transp.  Co*., 797  F.2d 206  (5th Cir.  1986).  Privity and

26   knowledge do not require actual knowledge, it is deemed to exist where ship owner could have

27   obtained information by reasonable and prudent inspection.  *In re Complaint of  Hercules*

28   *Carriers*, Inc., 768 F2d 1558 (11th Cir. 1985).  Owners are liable for what they "could have seen

if they had looked." *New York & Cuba Mail S.S. Co. v Continental Ins. Co*. 117 F2d 404 (2d Cir. 1941).

With respect to the duty of inquiry, the measure of knowledge is not what the owner actually knows but what he is charged with finding out. *Avera v Florida Towing Corp*. 322 F.2d 155, 166 (5th Cir. 1963). "[K]nowledge means not only personal cognizance but also the means of knowledge – of which owner or his [agent] is bound to avail himself – of contemplated loss or condition likely to produce or contribute to loss, unless appropriate means are adopted to prevent it." Id. In fact, "[p]rivity and knowledge are deemed to exist where the owner had the means of knowledge or, as otherwise stated, where knowledge would have been obtained from reasonable inspection. *China Union Lines, Ltd. v A. O. Andersen & Co*. 364 F2d 769, 787 (5th Cir. 1966) (Emphasis added).

**FINAL CONCLUSIONS**

Based upon all of the evidence shown in the exhibits filed herein and the applicable law, the court finds that the Majestic Blue was not seaworthy when it sailed from Guam on her final voyage on May 21, 2010, that all unseaworthy conditions were constructively and actually known to the Petitioner and, therefore, the Petitioner is not eligible to limit its liability under the Limitations Act.

Jürgen Unterberg, the General Manager of Majestic Blue Fisheries, LLC, was placed on notice repeatedly by its prior captains about the poor, corroded, and unseaworthy condition of the Vessel. He, himself, notified others about the poor and unseaworthy condition of the Majestic Blue. As early as January 30, 2010, in preparation for the 2010 drydock months later, he predicted in an email to Dongwon managers that the Vessel would sink. From that point forward, Unterberg was charged with knowledge of the dangerous physical condition of the Vessel. Despite being armed with this critical knowledge, he acquiesced to a substandard, incomplete and perhaps futile drydock in China. The court finds ample evidence of Petitioner's knowledge of the dangerous conditions aboard the Vessel and of Petitioner's acquiescence to these dangers. The Vessel sailed from China to Guam in an unseaworthy condition and then sailed from Guam until it sank also in an unseaworthy condition.

The Vessel was without adequate watertight doors that were wasted away, sailed with rotted and wasted structural posts and other equipment, sailed with improper and/or incomplete welding, with leaks, and in a generally and unreasonably old, corroded, and wasted condition. Based upon the reports and emails from its prior captains questioning her seaworthiness, the court finds the Vessel was destined to incur safety issues in some form or another and that the Petitioner knew of it. Petitioner May have taken some corrective actions to address the condition of the Vessel at its dry docking in China and in the afloat repairs in Guam, but those efforts lacked in providing a seaworthy vessel.

Further, Unterberg was consistently involved in messages concerning the inadequate crew. Captains Jeskevicius, Pine, and Ridenour all repeatedly reported the dangerous inadequacies of the crew in language, command and control, as well as their lack of training. The record is replete with messages to Unterberg complaining of crew who were simply without any training, could not pass safety drills, could not safely transfer fuel, could not pass abandon ship drills, did not listen to Captain's orders, engaged in mutiny, physically assaulted the Captain, could not make safety communications on the GMDSS, did not know how to speak English (including the Radio Officer) and who illegally dumped unauthorized materials and trash overboard. These inadequacies manifested themselves on the date of the sinking and contributed to the loss. The crew's failure to know how to monitor the excessive and constant leak, its failure to close the water tight doors when not in use, its failure to close the steering gear watertight door behind it after discovering the leak, its failure to close the water tight door near the entrance to the engine room after the steering gear alarm went off, its failure to render abandon ship in the proper language or through the proper channels, its failure to use the bilge pumps or discharge the brine, its failure to use the life raft, its failure to use the GMDSS, its failure to obtain and know how to use the EPIRB, its failure to retrieve the laptop computers and the logbooks, and its failure to use the EPIRB or even stay at the coordinates given to the Pacific Breeze on rescue all demonstrate the grossly inexperienced, deficient, and unseaworthy crew.

The court finds that Petitioner was aware that the Majestic Blue's crew owed allegiance

to its Fishing Master rather than its Captain, that the Captain was a necessary and indispensable person on board because the Vessel was a U.S. flagged ship, and that the Captain was merely a titular head. Petitioner knew that the Fishing Master generally hired the rest of the Vessel's crew, that those he hired were his personal friends, and owed allegiance to him. Petitioner knew that on board the Majestic Blue was a Captain without authority and a Fishing Master who exercised authority over the crew. This was a contributing factor to the crew's incompetency.

Petitioner also knew that Unterberg and Ridenour questioned the competency of one of its crew members, namely, Captain Hill and recommended that he not be hired. Petitioner was aware that Majestic Blue's last crew, unlike the previous crew, had a radio officer who did not speak English. Despite this, it acquiesced in his hiring by the Fishing Master. Petitioner was aware that its crew lacked basic skills in emergency situations and likewise were not trained for such emergencies as the one that beset the Vessel when it sank because it knew that the Vessel was in fact used for training of the crew. The court finds, as a matter of law, that the Vessel's crew was unseaworthy and that Petitioner knew it or should have known it. Thus, Petitioner cannot limit its liability as a result thereof.

Finally, it is clear that Petitioner was aware of what actually caused the loss – the excessive and constant leak through the rudder stock's packing gland. This excessive and constant leak – as characterized by Unterberg himself – presented itself at the dock in Guam and baffled the Petitioner's General Manager, a Marine Engineer. Despite this knowledge , and despite concerns by the Coast Guard that the excessive leak problem had not been resolved, Unterberg, along with Dongwon representatives, allowed the Vessel to push out to sea so it could earn money fishing instead of figuring out what was causing the rudder stock to leak excessively.

Unterberg could have hauled the Vessel from the water, could have sent divers underneath to examine the cause, could have – as he testified – tipped the vessel forward so the aft lifted out of the water and examined it in port. Instead of figuring out the root of the problem, Unterberg simply had the old bolts tightened and ordered Captain Hill – who Unterberg admitted was no engineering expert -- to monitor the leak at sea. Petitioner now

claims that the Vessel's rudder apparatus – in a wholly separate and unconnected event -- suddenly incurred a catastrophic failure that could not have been predicted; yet, the record shows the leak that sank the Vessel sprung from the same area that presented itself at dock. As such, the court finds that the cause of the rudder stock's excessive leaking and eventual failure was known to Unterberg and to the Dongwon representatives and should have been more thoroughly investigated before the Vessel went to sea. Instead, the evidence shows that Unterberg and Dongwon's representative were more concerned about getting the Vessel out of port in Guam so it could fish than fully determining the cause of the excessive leak in the rudder packing gland. The court finds that the Petitioner should have put the interests of safety before the interests of money and prudently investigated what all have conceded was a safety risk before the Vessel went to sea. Petitioner had the means to discover the Vessel's unseaworthy condition yet failed to do so and feigning blindness will not salvage its defense.

The court also finds that Unterberg was negligent when he ordered Captain Hill to cease the daily monitoring of the packing gland despite the agreement with the Coast Guard to monitor the rudder packing daily. Having been further placed on notice by Majestic Blue's prior Captains that the crew routinely disobeyed orders from the Captain, he should have, instead, ordered the Chief Engineer, a person who was competent in this area, to monitor the leak and make such reports. Likewise, he should have ordered the Chief Engineer to maintain the closure of the water tight doors in the shaft alley tunnel when not in use. Such orders, however, would exposed a major flaw in the composition of the crew, the limited ability of the crew to speak English and perhaps their inability to read English at all. For this, the Petitioner is liable and cannot limit its liability.

The court further finds that after the sinking, Unterberg may have had a consciousness of guilt and knew that he might have allowed an unseaworthy vessel to sail in pursuit of profits over safety. Evidence of this is found when Unterberg, on behalf on Petitioner, edited and changed his first survey report of the Vessel that described the Vessel's leak as excessive and constant by removing the words "excessive and constant" so that the new report simply read that the rudder packing gland "leaked." The court finds that this edit may be indicative of

Unterberg's frame of mind and his appreciation of the danger and liability to Majestic Blue when he used the words "excessive and constant." The removal of these words signify his appreciation of the enhanced danger befalling the Vessel had the words remained.

In conclusion, the court finds that Petitioner knew (1) the Vessel was generally unseaworthy due to its aforesaid condition, (2) knew specifically of the unseaworthy conditions manifesting itself at the rudder stock with an excessive and constant leak, (3) knew of the incompetency of the crew which lacked training, experience, a common language, communication skills, and basic emergency skills, and (4) knew that the Captain it provided the Majestic Blue was a mere figurehead-a ship master with no real authority. Because of its knowledge and because these were the unseaworthy conditions that caused the loss, Petitioner is not eligible to limit its liability.



**/s/ Joaquin V.E. Manibusan, Jr.**
**U.S. Magistrate Judge**
**Dated: Jul 25, 2014**